890 A.2d 310

**SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES**

v.

**Quinton DEMBY, et al.**

**No. 42, Sept. Term, 2005.**

Court of Appeals of Maryland.

Jan. 17, 2006.

582

Michael O. Doyle, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, of Baltimore), on brief, for petitioner/cross-respondent.

Stephen Z. Meehan (Joseph B. Tetrault, Pauline K. White and Tamal A. Banton of Prisoner Rights Information System of Maryland, Inc. of Chestertown), on brief for respondents/cross-petitioners.

Argued before BELL, RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

This matter has its origin in multiple decisions of the Inmate Grievance Office ("IGO") dismissing the grievances of Quinton Demby, Jesse Baltimore, Kenneth E. Woodall, Daniel Falcone, and Earl F. Cox, Jr. All are, or were,[1] inmates serving sentences in the Division of Correction ("DOC"). In

---

1.  Mr. Baltimore's appeal was dismissed by the intermediate appellate court as moot, because he was released on mandatory supervision prior to argument before the Court of Special Appeals and because respondents, then appellants, had acknowledged that Mr. Baltimore would have no remedy in damages if they were to prevail at that level. *Demby v. Secretary, Dep't of Pub. Safety and Corr. Servs.*, 163 Md.App. 47, 52, 877 A.2d 187, 190 (2005). According to the Petitioner's brief, Mr. Demby was released on mandatory supervision on August 11, 2004, prior to the decision of the intermediate appellate court. Both parties agree that Mr. Cox was released from incarceration, subject to the terms and conditions of mandatory supervision, on December 30, 2005.

  As to those inmates who have been released on mandatory supervision, the issues in this appeal are moot. With regard to the remaining incarcerated respondents, and other individuals similarly situated, we choose to address the merits of this case as it "presents unresolved issues in matters of important public concern that, if decided, will establish a rule for future conduct." *Coburn v. Coburn*, 342 Md. 244, 250, 674 A.2d 951, 954 (1996). The controversy in the instant case is certainly "capable of repetition." *State v. Parker*, 334 Md. 576, 584–85, 640 A.2d 1104, 1108 (1994) (quoting *Sosna v. Iowa*, 419 U.S. 393, 399–400, 95 S.Ct. 553, 557, 42 L.Ed.2d 532, 540–41 (1975)) (citation omitted).

his respective grievance, each inmate alleged that amendments to the Code of Maryland Regulations ("COMAR") adopted by the Department of Public Safety and Correctional Services ("the Department") were *ex post facto* laws, in violation of the United States Constitution and Article 17 of the Maryland Declaration of Rights. The regulations concerned "special project" diminution of confinement credits that were awarded to inmates for being double celled.[2]

The dismissed grievances were each appealed to the respective circuit courts in the counties in which the inmates were confined[3] and all of the dismissals were affirmed. Each respondent filed an application for leave to appeal the decisions to the Court of Special Appeals. The intermediate appellate court, in a reported opinion,[4] granted each respective application and consolidated the matters, ultimately reversing the circuit courts and remanding with instructions to reverse the Secretary and order further proceedings. *Demby, supra, v. Secretary, Dep't of Pub. Safety and Corr. Servs.*, 163 Md.App. 47, 877 A.2d 187 (2005). We subsequently granted the petition for writ of certiorari filed by the Secretary of Public Safety and Correctional Services ("the Secretary") and the cross-petition for writ of certiorari filed by respondents.[5] *Secretary of Corr. v. Demby*, 388 Md. 97, 879 A.2d 42 (2005). The Secretary presented two issues for our review, which we have recast as:

---

2. "Double celling" in this context occurs when an inmate shares a cell with another prisoner.

3. Respondents Demby, Baltimore, and Cox each filed petitions in the Circuit Court for Somerset County. Respondents Woodall and Falcone each filed petitions in the Circuit Court for Washington County.

4. The opinion of the intermediate appellate court was initially unpublished, but was later reported at the request of the respondents.

5. In our Order granting the petitions for writ of certiorari, we also granted the Secretary's motion for injunction, providing that the issuance of the mandate and enforcement of the judgment of the Court of Special Appeals be stayed until further order of this Court.

1. Are the amendments to former COMAR 12.02.06.05N(2) (now COMAR 12.02.06.04F(1)) "laws" and thus subject to the prohibition against *ex post facto* laws by the Federal and Maryland Constitutions?

2. If the amendments constitute laws within this context, do they violate the *ex post facto* prohibitions?

Respondents raise three issues. Two of the respondents' issues are encompassed in our rephrased questions above; respondents' additional question is:

1. Did the Secretary waive her principal argument here by not raising that argument in the circuit courts? [6]

For ·the reasons stated below, we conclude that the Secretary's amendments are laws within the meaning of *ex post facto* clause and that those amendments violate the prohibition against *ex post facto* laws under the Federal and Maryland Constitutions.

## *Facts*

In his application for leave to appeal, Mr. Demby admits that the Agency record is "meager" and proffers the following regarding his underlying charges and sentence:

> [Mr. Demby] is serving a term of confinement as a result of a sentence imposed on April 8, 1999[,] by the Circuit Court for Harford County as follows: No. 99C0042 Count 1— assault [2nd] degree, 10 years from 2/21/99; No. 98C1286 Count 1—distribution of a non-controlled substance, 2 years consecutive to No. 99C0042. The result is a term that expires on February 21, 2011.

---

**6.** We reject this contention by respondents because the issue of the implications of the *ex post facto* clause is evident in multiple aspects of the record. The issue was initially raised in the correspondence received by each respondent dismissing their initial complaints, and again in respondents' judicial review hearings before the IGO. We exercise our discretion to review any issue that plainly appears to have been raised in the record, and may consider issues not raised "if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." Md. Rule 8–131(a).

Mr. Demby initiated his case by filing an administrative remedy procedure complaint ("ARP")[7] that was received on May 15, 2002. Mr. Demby's complaint was reviewed by the warden and dismissed on June 10, 2002. An administrative appeal of this decision was received by the Commissioner of Correction (the "Commissioner") on June 20, 2002, and was dismissed by Assistant Commissioner of Correction on July 17, 2002. Mr. Demby's timely complaint was received by the IGO on August 13, 2002. The substance of Mr. Demby's IGO complaint was that his eligibility to earn special housing credits for double celling was terminated by the amendments to COMAR 12.02.06.05N, and that this violated the *ex post facto* clause. Mr. Demby's complaint was dismissed by the IGO on October 4, 2003.[8]

Mr. Demby's petition for judicial review was heard on May 16, 2003, in the Circuit Court for Somerset County. That

---

**7.** An ARP is a preliminary administrative remedy established by the DOC that is required to be exhausted before an inmate may file a complaint with the IGO. *See* Md.Code (1999), § 10–206(b) of the Correctional Services Article.

**8.** In his dismissal of Mr. Demby's grievance, the Executive Director of the IGO stated:

> The statutes give specific authority to the Commissioner of Correction, with the approval of the Secretary, to designate those programs or projects for which additional diminution credits may be awarded. COMAR 12.02.06.05N is the regulation promulgated by the Commissioner (as approved by the Secretary) pursuant to his statutory authorization which sets forth the eligibility criteria for entitlement to double-celling credits (identified as a "Special Project"). That regulation was revised effective January 1, 2002. More importantly for purposes of this review, it precludes inmates from being awarded special project credits if the inmate's "term of confinement" includes a sentence for a list of enumerated offenses. Inasmuch as the statute allowed the Commissioner of Correction to define these projects or programs for which Special Project Credits are available, the eligibility established was within his authority to create.

> When you were committed to the custody of the Commissioner of Correction you became subject to various policies which were in effect at that time—and which were subject to change. A revision affecting eligibility criteria for Special project Credits is not the equivalent of an *ex post facto* law.

The IGO dismissals of the grievances of respondents Messrs. Baltimore, Woodall, Falcone, and Cox also contained this language.

court affirmed the decision of the IGO, finding that the Secretary and Commissioner have the authority to abolish, revoke, or revise the eligibility standards for double-celling credits. The Circuit Court also found that the *ex post facto* clause did not apply to Mr. Demby's case. On June 12, 2003, Mr. Demby filed for leave to appeal from the decision of the Circuit Court for Somerset County.

The procedural histories of respondents, Messrs. Baltimore, Woodall, Falcone, and Cox are similar to that of Mr. Demby. Previously, all respondents had been eligible for special project credits for double celling, but were precluded from such credits as a result of the January 1, 2002, amendment to COMAR 12.02.06.05 ("the amendments"). Mr. Demby was serving a term of confinement for both qualifying and disqualifying sentences, and was informed on May 15, 2002, in response to his ARP, that, as a result of the amendment, he would no longer be eligible for special project credits because his sentence included a disqualifying offense. Mr. Woodall is serving a term of confinement for both qualifying and disqualifying sentences. Subsequently, in response to his ARP, the DOC informed Mr. Woodall that as of January 1, 2002, he was no longer eligible for special project credits for housing because his charge for kidnapping was included as a disqualifying offense per the amendment. Similarly, Mr. Falcone's term of confinement consists of a sentence for robbery with a deadly weapon, a qualifying offense, and a consecutive sentence for carjacking, a disqualifying offense. The carjacking sentence precluded Mr. Falcone from receiving special project credits for housing after the amendment. Mr. Cox was serving a sentence for assault, a qualifying offense, and for use of a handgun in the commission of a crime of violence, which always has been a disqualifying offense. On April 20, 2000, Mr. Cox's handgun sentence ended, beginning his eligibility for double-celling credits. While the record is unclear as to the specific crimes respondents committed, we note that all respondents were serving terms of confinement that included at least one sentence that made them eligible to receive special

project housing credits for double celling prior to the amendment.

The respondents who remain incarcerated provided the following updated information on their current situations in their brief:

Based on information provided to counsel by the DOC, the projected mandatory release date for Respondent Kenneth E. Woodall, currently incarcerated in Maryland Correctional Institution in Hagerstown, is May 13, 2010 (as of June 30, 2005). The projected release date for Respondent Daniel Falcone, currently incarcerated at the Maryland Correctional Training Center, also in Hagerstown, is October 11, 2008 (as of July 31, 2005).

The dismissals of the respondents' grievances were affirmed by the Circuit Courts for Somerset and Washington Counties. After granting respondents' petitions for leave to appeal, the Court of Special Appeals held that the COMAR amendments were laws for *ex post facto* purposes, "by virtue of the legislative discretion granted to the Secretary and the Commissioner pursuant to Corr. Serv. § 3–707." *Demby, supra,* 163 Md.App. at 67–68, 877 A.2d at 199. Further, the intermediate appellate court held that the amendments violated the *ex post facto* prohibition because the "application of current COMAR § 12.02.06.04F . . . alters [respondents'] punishments by increasing the lengths of their sentences." *Id.* at 64, 877 A.2d at 197. In its reversal of the opinions of the respective circuit courts and the decisions of the Secretary, the Court of Special Appeals noted:

With this opinion, we do not suggest that once double-celling credits are established they must remain unchanged and available to all inmates in perpetuity. Clearly, current COMAR § 12.02.06.04F may lawfully be applied to inmates who committed their offenses after it took effect. Nor do we suggest that an inmate who is serving a sentence for an offense that is eligible for double-celling credits may not be removed to a single cell in accordance with DOC policies and regulations.

We hold only that an inmate serving a term of confinement for an offense committed prior to January 1, 2002(i) may not be denied double-celling credits, for periods of time during which he or she was or is serving only an eligible sentence, for the sole reason that another sentence in his or her term of confinement is ineligible, and (ii) may not be denied double-celling credits on sentences for offenses that were eligible under the former regulation but are ineligible under the current regulation.

*Id.* at 68, 877 A.2d at 199–200 (footnote omitted). We granted both side's petitions for writ of certiorari.

### The Special Project Credit Regulations

The current provision that governs special project housing credits is COMAR 12.02.06.04:

A. Diminution credit [9] may be awarded under Correctional Services Article, §§ 3–703 [thru] 3–707, Annotated Code of Maryland, in one or more of the following categories:

(1) Good conduct;

(2) Work tasks;

(3) Education; or

---

9. Md.Code (1999 & 2005 Supp.), § 3–702 of the Correctional Services Article provides:

    Subject to § 3–711 of this subtitle and Title 7, Subtitle 5 of this article, an inmate committed to the custody of the Commissioner is entitled to a diminution of the inmate's term of confinement as provided under this subtitle.
    Md.Code (1999) § 3–707 of the Correctional Services Article provides:
    (a) In addition to any other deductions allowed under this subtitle, an inmate may be allowed a deduction of up to 10 days from the inmate's term of confinement for each calendar month during which the inmate manifests satisfactory progress in those special selected work projects or other special programs designated by the Commissioner and approved by the Secretary.
    (b) A deduction described in subsection (a) of this section shall be calculated:
    (1) from the first day that the inmate is assigned to the work project or program; and
    (2) on a prorated basis for any portion of the calendar month during which the inmate participates in the work project or program.

(4) Special projects.

\* \* \* \*

E.  Special Projects Credit.

(1) The Commissioner, with the approval of the Secretary and based on the Division's current policy and procedure, may establish a list of assignments that qualify for special projects credit that may, but need not, be limited to the following:

(a) Prison industry assignments;

(b) Education programs;

(c) Work details;  or

(d) Work release employment.

(2) Special projects credit awarded by a local detention center, between the date an inmate is sentenced to the custody of the Commissioner and the date the inmate is transferred to the Division, shall qualify as special projects credit.

F.  Special Projects Credit for Housing.

(1) Except as provided in § F(3) of this regulation, an inmate may be awarded special projects credit for housing under Correctional Services Article, § 3–707, Annotated Code of Maryland, if the inmate is:

(a) Assigned to a cell containing two beds and is not serving a period of disciplinary segregation;  or

(b) Housed in a dormitory or dormitory-type housing and the housing area where the inmate is confined does not provide 55 square feet of living space per inmate, exclusive of dayrooms, toilets, and showers.

(2) An inmate may be awarded a maximum of five special projects credits for housing for each calendar month, and on a prorated basis for any portion of a calendar month, beginning on a date and ending on a date the Secretary determines appropriate, based on the demand for inmate housing and services in the Division, subject to §§ F(3) and G of this regulation.

(3) An inmate may not be awarded special projects credit under this section during the inmate's term of confinement if the inmate is serving a term of confinement that includes a:

(a) Sentence for:

(i) Abduction;

(ii) Arson in the first degree;

(iii) Carjacking or armed carjacking;

(iv) Kidnapping;

(v) Manslaughter, except involuntary manslaughter;

(vi) Mayhem and maiming, as previously proscribed under Article 27, §§ 384–386, Annotated Code of Maryland;

(vii) Murder or attempted murder;

(viii) Use of a handgun in the commission of a felony or other crime of violence;

(ix) Child abuse, abuse or neglect of a vulnerable adult, or child sale, barter, or trade under Criminal Law Article, § 3–601, 3–602, or 3–603, Annotated Code of Maryland;

(x) Assault on a Division inmate or employee under Criminal Law Article, § 3–205, Annotated Code of Maryland;

(xi) A drug crime; or

(xii) An offense which would cause the offender to be defined as a child sexual offender, offender, sexually violent offender, or sexually violent predator under Criminal Procedure Article, Title 11, Subtitle 7, Annotated Code of Maryland;

(b) Mandatory sentence for the commission of a felony; or

(c) Sentence as a repeat offender under Criminal Law Article, § 14–101, Annotated Code of Maryland.

(4) This section may not be interpreted, understood, or construed to mean that an inmate who is eligible to receive the credits described in this section has a right to these credits or that an inmate will continue to receive these credits in the future.

G. An inmate may not be awarded more than 20 diminution credits for a calendar month.

COMAR 12.02.06.04F is the most recent version of the regulation governing special project credits, and it was amended on January 1, 2002, as an emergency provision, 29:4 Md. R. 413, and the emergency status was extended at 29:15 Md. R. 1140. The version of the regulation that was in effect at the time the respondents in this case committed their crimes,[10] was COMAR 12.02.06.05N, which provided, in pertinent part:

N. Special Project Credit for Double Celled Inmates.

(1) Inmates who meet the eligibility criteria in § N(2) are in a special project pursuant to Article 27, § 700(f), Annotated Code of Maryland, except inmates who are serving a:

---

**10.** To prevail in an *ex post facto* claim, respondents must first show that the law that they are challenging applies retroactively to *conduct that was completed before the enactment of the law in question,* and secondly, they must prove that the change in law "raises the penalty from whatever the law provided when he [or she] acted." *Johnson v. U.S.,* 529 U.S. 694, 699, 120 S.Ct. 1795, 1800, 146 L.Ed.2d 727 (2000) (emphasis added). The conduct in question in the instant case is the commission of each respondents' respective crimes; therefore we focus on the date the petitioners' crimes were committed and the law in effect at that time, and not the date upon which they were sentenced. *See Beazell v. Ohio,* 269 U.S. 167, 169–70, 46 S.Ct. 68, 68, 70 L.Ed. 216 (1925) (noting that the *ex post facto* clause prohibits "any statute which ... makes more burdensome the punishment for a crime, after *its commission,* or which deprives one charged with crime of any defense available according to law *at the time when the act was committed* " (emphasis added)); *Calder v. Bull,* 3 Dall. (U.S.) 386, 391, 1 L.Ed. 648 (1796) (holding that a statute is considered to be in violation of the *ex post facto* clause when it inflicts a greater punishment for the commission of a crime than that which was originally assigned to the crime *when committed* (emphasis added)).

In *Anderson v. Department of Health and Mental Hygiene,* we stated that

[w]hile the *ex post facto* prohibition relates only to criminal offenses, the Supreme Court has enunciated the principle that the prohibition extends broadly to "any law passed after *the commission of an offense* which ... 'in relation to that offense, *or its consequences,* alters the situation of a party to his disadvantage.' "

310 Md. 217, 224, 310 Md. 217, 528 A.2d 904, 908 (1987), *cert. denied, Maryland v. Anderson,* 485 U.S. 913, 108 S.Ct. 1088, 99 L.Ed.2d 247 (1988) (citations omitted) (emphasis added).

(a) Sentence for murder, rape, sex offenses, child abuse, drug trafficking or distribution, or use of a firearm in the commission of a felony;

(b) Mandatory sentence for the commission of a felony; or

(c) Sentence as a repeat offender under Article 27, § 643B, Annotated Code of Maryland.

(2) Inmates eligible for special project credits under this section are inmates who:

(a) Have agreed to be voluntarily double-celled;

(b) Are double-celled in an institution which is required by court order to be single-celled or by court order has a population cap and the population cap is exceeded; or

(c) Are double-celled in an institution which is not under court order but where the number of double cells exceeds the single-cell design capacity of the institution; or

(d) Are housed in a dormitory or dormitory-type housing and the housing area where the inmates are confined does not provide for 55 square feet of living space per inmate exclusive of dayrooms, toilets, and showers.

(3) Inmates who meet the criteria described above shall receive 5 days credit for each calendar month, and on a prorated basis for any portion of a calendar month, beginning on the date and ending on the date the Secretary determines appropriate, based on the demand for inmate housing and services in the Division of Correction.

(4) And inmate may not, under any circumstances, be entitled to earn from all sources, including this regulation, more than the statutory maximum of 15 credit days per month.

(5) The Commissioner shall revoke all special project credits earned under this section if, within 30 days before the inmate's release on mandatory supervision, an inmate is found guilty of an intentional rule violation for:

(a) Assault;

(b) Possession of contraband;

(c) Escape; or

(d) Attempted escape.

(6) The Department of Public Safety and Correctional Services shall give the name, last known address, date of birth, release date, and current convictions, of each inmate released, to the state or local law enforcement officials in the jurisdiction into which the inmate is released.

(7) This regulation may not be interpreted, understood or construed to mean that inmates who are eligible to receive the credits described in this section have any right to those credits on that inmates will continue to receive those credits in the future.

This former COMAR regulation was analyzed by the Court of Special Appeals in *Smith v. State*, 140 Md.App. 445, 780 A.2d 1199 (2001).

Ramarro Smith was an inmate in DOC custody at the time the Court of Special Appeals rendered its decision. He was denied "special project" credits that he allegedly had earned through double celling during his incarceration. *Smith*, 140 Md.App. 445, 448–49, 780 A.2d 1199, 1201. The Circuit Court for Baltimore City denied Smith's petition for writ of habeas corpus, and the Court of Special Appeals granted his application for leave to appeal. *Smith*, 140 Md.App. at 448–49, 780 A.2d at 1201–1202. Smith was sentenced to thirty-years incarceration for second-degree murder, and his sentence began on June 10, 1977. *Smith* 140 Md.App. at 449, 780 A.2d at 1202. Smith was paroled on January 5, 1989, and, subsequently, the Maryland Parole Commission issued a parole violation warrant as a result of a reasonable belief that Smith had violated parole. *Id.* Smith's parole was revoked, and the parole commissioner awarded him 273 of the 373 days he had been on parole as "street time credit." *See* Md.Code 1999, § 7–401(d)(1) of the Correctional Services Article. Smith returned to the DOC and his maximum term of confinement date was recalculated. *Id.* at 450, 780 A.2d at 1202. After his return to the DOC, Smith was convicted for a robbery that he committed while on parole and was sentenced to a five-year

term consecutive to his murder sentence. *Id.* The DOC refused to give Smith special project credits for double celling. *Id.* Smith argued that the hearing court erred in failing to award him special project credits for double celling which accrued during his robbery sentence. *Id.* at 451, 780 A.2d at 1203. The DOC responded that the fact that Smith was serving a term of confinement for a murder sentence precluded his earning double-celling credits under the regulations. *Id.* at 452, 780 A.2d at 1203. In support of its position, the DOC cited § 3–702 of the Correctional Services Article which provides for an entitlement to diminution of confinement credits as a result of an inmate's "term of confinement" rather than "sentence." *Id.*

The Court of Special Appeals held in *Smith, inter alia,* that precedent supported the contention that the intermediate appellate court had already considered and "rejected attempts to narrow eligibility for diminution credits by using the 'term of confinement' concept to deny an inmate credits against a sentence that is eligible for them." *Id.* at 460, 1208. Pursuant to the rule that governs good conduct credits, the intermediate appellate court ultimately held that, "when an inmate's term of confinement includes both a sentence that is not eligible for the special project credits in question and a consecutive sentence that is eligible for those credits, the two sentences must be considered separately, so that the inmate may reduce his or her term of confinement by earning special project credits against the eligible sentence." 140 Md.App. at 461, 780 A.2d at 1209. In addressing the DOC's argument that application of good conduct credits and special project credits should be distinguished, the Court of Special Appeals stated:

> The fact that special project credits are legislatively authorized, but not mandated, does not justify the DOC's denial of special project credits. We think the DOC has missed the broader lesson of these "good conduct" cases—that diminution credits, once they are created, should be earned and calculated against the eligible sentence of an inmate rather than against his or her entire term of confine-

ment. The DOC established double celling as a special project under the authority of section 3–707. Once the special program was created and defined in accordance with section 3–707, it became a legislatively created benefit, albeit one accomplished through the Secretary and Commissioner. Exercising the discretionary authority given by the legislature, the Secretary and Commissioner selected eligibility standards for earning double-celling credits, and then promulgated a regulation adopting those standards in order to confer the benefit of double-celling credits on inmates. At that point DOC was bound by its regulation. *See Hopkins,* 40 Md.App. at 336, 391 A.2d 1213.

The DOC is now obligated to honor and follow the regulation as it is written. If an inmate serving an eligible sentence qualifies for double-celling credits, then the inmate may not be denied those credits. The DOC may not enact the regulation and then ignore an inmate who falls within its ambit. *See, e.g., id.* at 336–37, 780 A.2d 1199, 40 Md.App. 329, 391 A.2d 1213 (reversing order sentencing inmate to isolated confinement, because DOC violated its own rules governing such sentencing, which "confer[red] important procedural benefits and safeguards").

We are not persuaded otherwise by language in subsection (7) of the DOC regulation that "[t]his regulation may not be interpreted, understood, or construed to mean that an inmate who is eligible to receive the credits described in it has a right to these credits or that an inmate will continue to receive these credits in the future." COMAR 12.10.06.05N(7). We do not read this language as reserving unlimited authority in the DOC. As we have discussed, the DOC does not have complete discretion to deny double-celling credits to inmates who clearly meet the eligibility standards in the regulation. Accordingly, we shall not construe this language as an attempt to confer on the DOC impermissible authority to exercise its power and discretion in an arbitrary manner that conflicts with its own regulation.

Instead, we view this language as a forthright reminder that the Secretary and Commissioner have authority to abolish, to revoke, or to revise the eligibility standards for double-celling credits. Under section 3–707, they may determine whether any special project credits are available, what projects earn such credits, how many credits may be earned, and who may earn them. Subsection (7) does not expand, but merely reserves this authority.

*Smith,* 140 Md.App. at 461–62, 780 A.2d at 1209–10. The intermediate appellate court remanded the case to the hearing court to determine if Smith was eligible for any double-celling credits for the time served on his robbery sentence. *Id.* at 462–63, 780 A.2d at 1210.

### *Discussion*

### I.

Are the amendments to former COMAR 12.02.06.05N(2) (now COMAR 12.02.06.04F(1)) "laws" and thus subject to the prohibition against *ex post facto* laws by the Federal and Maryland Constitutions?

The *ex post facto* prohibition applies to "statutory changes and also . . . to changes in administrative regulations that represent an exercise of delegated legislative authority, as opposed to an interpretation of legislation by an agency authorized to execute, not make, laws." *Prater v. U.S. Parole Comm'n,* 802 F.2d 948, 953–54 (7th Cir.1986) (citations omitted). Petitioner argues that the COMAR amendments were not laws for the purposes of the *ex post facto* Clause because the amendments were interpretive in nature, and were merely a result of a change in policy by the Secretary and the Commissioner as to how double-celling credits should be awarded and as to which inmates should be eligible to receive such credits. Petitioner relies upon our decision in *Watkins v. Secretary Dept. of Public Safety and Correctional Servs.,* 377 Md. 34, 831 A.2d 1079 (2003), and analogizes the arguments of the respondents in the instant case to those of the inmates in *Watkins.*

In *Watkins*, the focus of our *ex post facto* analysis was not "special project" credits, but DOC directives that affected security classification, work release, and family leave. With regard to security classification, the DOC maintained a subjective policy that based transfers to minimum security and pre-release on a discretionary assessment by the DOC classification team. *Watkins, supra,* 377 Md. at 37, 831 A.2d at 1081. While changes in the policy occurred, the general policy of the DOC "did not exclude all inmates serving life sentences from the pre-release system." *Id.* The DOC formally changed its policy on December 1, 1994, and declared that "no inmates sentenced to life imprisonment could be transferred below medium security." *Id.* at 38, 831 A.2d at 1081. Subsequently, in June 1995, the DOC issued DOC directive ("DCD") 100–005 which stated that "[i]nmates serving life sentences shall be initially classified at no less than maximum security and shall not be reclassified below medium security." *Id.* (citing DCD 100–005.II.N.1.b). The DOC also included security classification limits on inmates serving a term of confinement for rape or sex offenses, stating that those offenders "shall not be reduced below medium security unless approved for a delayed parole release contingent upon a transfer to lesser security . . . or unless within one year of a mandatory supervision release date or maximum expiration release date." *Id.*

On June 2, 1993, after an inmate who had been serving a life sentence murdered his girlfriend while on work release, the Commissioner suspended all work release privileges of inmates serving life sentences. DCD 100–508 was subsequently amended, making all inmates serving life sentences "ineligible for work release." *Id.* at 39, 831 A.2d at 1082. The final amended DCD involved family leave. Prior to the Commissioner's amendment, § 3–811 of the Correctional Services Article granted authority to the Commissioner to allow an inmate to visit his family for a reasonable time if the inmate was (1) confined to a DOC correctional facility; (2) classified to be in pre-release status; and (3) recommended by the correctional facility's case management team and managing official. *Id.* (citing Md.Code (1999) § 3–811 of the Correction-

al Services Article). On June 2, 1993, the Commissioner declared that all life-sentenced inmates were ineligible for family leave. *Id.* DCD 100–543 followed, stating that "[i]nmates serving life sentences, including life with all but a portion suspended, and inmates under a sentence of death are not eligible for family leave consideration." *Id.* at 40, 831 A.2d at 1082.

The inmates each appealed from their denials of relief issued in their respective circuit courts. *Watkins, supra,* 377 Md. at 45, 831 A.2d at 1085. The Court of Special Appeals consolidated the inmates' appeals and this Court issued a writ of certiorari prior to any proceedings in the intermediate appellate court. *Id.* The issue decided by this Court was whether, as applied to the inmates, the DCDs at issue violated the Constitutional prohibition against *ex post facto* laws. *Id.,* 831 A.2d at 1085–86. We ultimately determined that the DCDs at issue did not violate the *ex post facto* clause "because they [were] not 'laws' within the meaning of the United States Constitution or Maryland Declaration of Rights. Rather, the DCDs were guidelines promulgated as an exercise of the discretion of the Commissioner of Correction who has authority to modify them." *Id.* at 45, 831 A.2d at 1086. The inmates in *Watkins* argued that the DCDs at issue constituted "laws" for the purposes of the *ex post facto* prohibition because they were " 'legislative rules' [that prevent] the staff of the DOC from exercising any discretion over assigning a lesser security classification." *Id.* at 46, 831 A.2d at 1086. The inmates further argued that the DCDs enhanced the punishments for their crimes by changing the parole eligibility rules after the date of the offenses committed by the inmates. *Id.* at 47, 831 A.2d at 1086–87. The Secretary in *Watkins* countered by asserting that the DCDs merely annunciated the manner in which the Commissioner intended to exercise his discretion concerning security classifications. *Id.*

In our discussion, we relied upon *Gluckstern v. Sutton,* 319 Md. 634, 574 A.2d 898 (1990), *cert. denied, Henneberry v. Sutton,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990), where "we interpreted the *ex post facto* clause to prohibit the

retroactive application of a statute requiring the Governor to approve parole for inmates serving life sentences at the Patuxent Institution. *Watkins, supra,* at 48, 831 A.2d at 1087 (citing *Gluckstern, supra,* 319 Md. at 668, 574 A.2d at 914). The inmate who brought the claim in *Gluckstern* began serving a life sentence at Patuxent when the Institutional Board of Review of the Patuxent Institution 'retained exclusive control to parole a Patuxent inmate.' " *Gluckstern, supra, 319 Md.* at 642, 574 A.2d at 901. The General Assembly subsequently enacted a statute that required the Governor to approve parole for all inmates serving life sentences. *Id.* at 643, 574 A.2d at 902. We concluded that the retroactive application of that statute, which modified the inmate's parole eligibility, " 'substantially alter[ed] the consequences attached to a crime already completed and therefore change[d] the quantum of punishment.' " *Id.* at 668, 574 A.2d at 914 (citation omitted).

We distinguished *Gluckstern* from those federal cases that held that the *ex post facto* prohibition did not apply to changes by the United States Parole Commission to its own discretionary guidelines for granting parole, because the federal opinions dealt with guidelines that did not have " 'the force and effect of law' but are merely 'polic[ies] . . . that show how agency discretion is likely to be exercised.' " *Id.* at 672, 574 A.2d at 916 (citations omitted). Because the Parole Commission could choose not to follow the guidelines in a prisoner's case, as statements of discretionary administrative policy, we found that they did not affect a prisoner's punishment "either actually or potentially." *Watkins, supra,* 377 Md. at 49, 831 A.2d at 1088 (citing *Gluckstern, supra,* 319 Md. at 672, 574 A.2d at 916) (citations omitted).

Judge Battaglia, writing for this Court in *Watkins,* found our emphasis on the distinction between discretionary and non-discretionary administrative policy directives in *Lomax v. Warden, Md. Corr. Training Ctr.,* 356 Md. 569, 741 A.2d 476 (1999), to be notable. In *Lomax,* the petitioner filed a petition for writ of habeas corpus in response to the Governor's announcement in 1995 that he would not approve parole for any inmates sentenced to life in prison unless they were very

old or terminally ill, and that he had instructed the Parole Commission not to bother recommending murderers and rapists to him for parole. 356 Md. at 573, 741 A.2d at 478. Having been convicted of first-degree murder and sentenced to life in prison, Lomax argued that the Governor's statement effectively changed his sentence to life without the possibility of parole. *Id.* With regard to the effect of the Governor's statement, we held:

> If the General Assembly in 1995 had enacted a statute restricting the Governor's discretion to approve the parole of inmates serving life sentences, and providing that the Governor could only approve the parole of those beyond a certain age or who were terminally ill, the holding in *Gluckstern* would preclude the application of the statute to Lomax. No such statute or regulation, however, has been enacted. The Governor today has the same discretionary authority under the law regarding the parole of persons in Lomax's position as a Governor had in 1969 or 1967.

*Id.* at 577, 741 A.2d at 480.

> We recognized that, although in the context of the *ex post facto* clause, the "concept of a 'law'... is broader than a statute enacted by a legislative body, and may include some administrative regulations," it does not encompass " 'guidelines assisting [a government agency] in the exercise of its discretion.' " Therefore, whether an administrative provision qualifies as a "law" for *ex post facto* purposes depends in large part on the manner and extent that it limits an agency's discretion.

*Watkins*, 377 Md. at 49, 831 A.2d at 1088 (citations omitted). If the provision "do[es] not have the force and effect of law" but simply announces how an agency is likely to exercise its discretion, "the *ex post facto* clause does not apply." *Id.* (Citations omitted.)

In *Watkins* we found "no meaningful difference between the promulgation of the DCDs at issue in that case and the Governor's statement in *Lomax*," and we noted that the Commissioner's authority to establish policies that govern the

inmates in her custody is similar to the Governor's authority to exercise discretion over parole decisions. *Id.* at 50, 831 A.2d 1079, 831 A.2d at 1088–89. Our decision in that case turned on the extent of the Commissioner's discretion. Acknowledging that certain administrative rules may be considered "law" in the *ex post facto* context, we reiterated that such rules are not subject to the prohibition against *ex post facto* prohibition if the rules merely serve as " 'guides . . . that may be discarded where circumstances require.' " *Id.* at 52, 831 A.2d at 1090 (citing *Lomax, supra,* 356 Md. at 576, 741 A.2d at 480). In our consideration of the Commissioner's discretion in *Watkins,* we noted that the Commissioner has discretion to establish policy guidelines regarding security classifications "without legislative ratification." *Id.* As such, we held that the Commissioner, in the context of carrying out his or her policies on security classifications, inmate ineligibility for work release, and family leave, "unilaterally, may adopt or discard whatever DCDs he or she deems appropriate." *Id.* at 53, 831 A.2d at 1090. Thus, we held that the DCDs in *Watkins* did not violate the *ex post facto* prohibition.

The intermediate appellate court in the present case addressed the impact of *Watkins.* It said: "The [Court of Appeals] by no means implied in *Watkins,* however, that the Legislature has given the Commissioner discretion to make a prisoner's punishment more burdensome than it was at the time the offense was committed." *Demby, supra,* 163 Md. App. at 64, 877 A.2d at 197. The Court of Special Appeals also acknowledged that its opinion in *Smith, supra,* did not quantify the special projects credits for double celling as a law, but did note that it was established under the authority of § 3–707 of the Correctional Services Article and "[o]nce the special program was created and defined in accordance with section 3–707, it became a legislatively-created benefit, albeit one accomplished through the Secretary and Commissioner." *Demby, supra,* 163 Md.App. at 62–63, 877 A.2d at 196 (quoting *Smith, supra,* 140 Md.App. at 461, 780 A.2d at 1199).

Primarily, Petitioner argues that, similar to the directives upheld in *Watkins,* the Secretary and Commissioner's current

policies regarding the eligibility criteria for double celling can be revised at any time and are thus not laws for the purposes of the *ex post facto* prohibition. The clear distinction between *Watkins* and the instant case is the method in which the regulations are submitted and approved. Petitioner, citing a case from the Ninth Circuit, contends that the promulgation of the regulations at issue through the notice and comment rule making procedures of the Administrative Procedure Act, Md. Code (1984, 2004 Repl.Vol.), §§ 10–101 *et seq.* of the State Government Article, does not transform them into laws for the purposes of the *ex post facto* prohibition. Unlike the purely verbal expression of policy intent by the Governor in *Lomax,* the Secretary's amendments in this case were submitted as emergency regulations pursuant to Md.Code (1984, 2004 Repl. Vol.), § 10–111(b) and were published in the Maryland Register, subject to public comment, and committee approval. Similarly, the amendments are distinct from the DCDs in *Watkins,* as DCDs are not submitted pursuant to the Administrative Procedure Act. *See Demby, supra,* 163 Md.App. at 63 n. 10, 877 A.2d at 196 n. 10.

■ In the determination of whether the amendments in the present case are laws for the purposes of the *ex post facto* prohibition, we must focus our analysis on the nature of the amendment. The United States Court of Appeals for the Fourth Circuit has noted the relevant factors to consider when determining whether actions of administrative agencies are exempt from scrutiny under the *ex post facto* clause:

"When Congress has delegated to an agency the authority to make a rule instead of making the rule itself, the resulting administrative rule is an extension of the statute for purposes of the [C]lause." *Rodriguez v. United States Parole Comm'n,* 594 F.2d 170, 173 (7th Cir.1979). The reason for applying the Clause to such legislative rules is straightforward: Congress "should not be allowed to do indirectly what it is forbidden to do directly." *Prater,* 802 F.2d at 954. But when an agency promulgates an interpretive rule, the *Ex Post Facto* Clause is inapplicable. "[I]nterpretive rules simply state what the administrative agency

thinks the statute means, and only 'remind' affected parties of existing duties." *Jerri's Ceramic Arts, Inc. v. Consumer Product Safety Comm'n,* 874 F.2d 205, 207 (4th Cir.1989). Unlike legislative rules, which "ha[ve] the force of law," *id.,* interpretive rules "are statements of enforcement policy. They are . . . 'merely guides, and not laws: guides may be discarded where circumstances require; laws may not.'" *Prater,* 802 F.2d at 954 (quoting *Inglese v. United States Parole Comm'n,* 768 F.2d 932, 936 (7th Cir.1985)).

*United States v. Ellen,* 961 F.2d 462, 465 (4th Cir.1992), *cert. denied, Ellen v. U.S.,* 506 U.S. 875, 113 S.Ct. 217, 121 L.Ed.2d 155 (1992).

In *Ellen,* the defendant was charged with several counts stemming from his alleged discharge of pollutants from a source in areas alleged to be wetlands. *Ellen, supra,* 961 F.2d at 465. The definition of "wetlands" promulgated by the Environmental Protection Agency ("EPA") was unchanged from the time Ellen allegedly committed his violations in 1987 until trial. *Id.* Ellen argued, however, that the use at trial by some government witnesses of a 1989 Manual, which was more inclusive in its definition of "wetlands," violated the *ex post facto* clause because the trial court admitted this testimony and essentially, allowed the jury to convict him based on this later-adopted policy. *Id.* The 4th Circuit Court of Appeals held that the use of the 1989 Manual did not violate the *ex post facto* clause because it found "no indication that promulgation of the 1989 Manual was an exercise of the agencies' delegated legislative function." *Id.* at 466. Because the manual did not "impose[] new rights or duties," and because it was not submitted through the notice and comment rule making procedures of the federal Administrative Procedure Act,[11] the court found that the manual was interpretive, rather than legislative in nature, and thus was not a "law" within the meaning of the *ex post facto* clause. *Id.* (quoting *Jerri's Ceramic Arts, Inc. v. Consumer Product Safety Comm'n,* 874 F.2d 205, 207 (4th Cir.1989)).

---

11. 5 U.S.C. § 551 *et seq.*

Such a distinction between "interpretative" rules and "something more," i.e., "substantive" or "legislative" rules, is not always easily made. Nonetheless, courts are in general agreement that interpretative rules simply state what the administrative agency thinks the statute means, and only "remind" affected parties of existing duties. *Chula Vista City School District v. Bennett,* 824 F.2d 1573, 1582 (Fed. Cir.1987); *Southern California Edison Co. v. Federal Energy Regulatory Commission,* 770 F.2d 779, 783 (9th Cir. 1985); *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1562 (D.C.1984); *Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir.1952). In contrast, a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties. *National Latino Media Coalition v. Federal Communications Commission,* 816 F.2d 785, 788 (D.C.Cir.1987)[.]

*Id.* at 207–208.

The amendment in question here is clearly a "regulation" pursuant to the definition of regulation in the Administrative Procedure Act ("APA"), Md.Code (1984, 2004 Repl.Vol.), § 10–101(g) of the State Government Article.[12] The amendment

---

**12.** Regulation is defined by the APA as:

(g)(1) "Regulation" means a statement or an amendment or repeal of a statement that:
(i) has general application;
(ii) has future effect;
(iii) is adopted by a unit to:
1. detail or carry out a law that the unit administers;
2. govern organization of the unit;
3. govern the procedure of the unit; or
4. govern practice before the unit; and
(iv) is in any form, including:
1. a guideline;
2. a rule;
3. a standard;
4. a statement of interpretation; or
5. a statement of policy.
(2) "Regulation" does not include:
(i) a statement that:
1. concerns only internal management of the unit; and
2. does not affect directly the rights of the public or the procedures available to the public;

was adopted for the purposes of determining who is eligible for special project housing credits and substantively affected the rights of a specific group of inmates by taking away the eligibility for those credits. This subtitle applies to both the Secretary and the DOC. *See Massey v. Secretary, Dep't of Pub. Safety and Corr. Servs.*, 389 Md. 496, 498–500, 886 A.2d 585, 586–87 (2005) (noting that the State Government Article of the Maryland Code, Title 10, subtitle 1 (encompassing §§ 10–101 through 10–117) applies to both the DOC and the Department of Public Safety and Correctional Services). The regulation, unlike the DCDs mentioned *supra*, were part of the notice and comment procedure per the APA.[13] Our next determination must focus on whether this regulation is legislative or merely interpretive in nature. We find that the amendments in the instant case are not merely guides that may be discarded where circumstances require. The amendments here are substantive, pursuant to properly delegated authority in Md.Code (1999), § 2–109(c)[14] of the Correctional

---

(ii) a response of the unit to a petition for adoption of a regulation, under § 10–123 of this subtitle; or

(iii) a declaratory ruling of the unit as to a regulation, order, or statute, under Subtitle 3 of this title.

(3) "Regulation", as used in §§ 10–110 and 10–111.1, means all or any portion of a regulation.

The APA defines "substantively" as "a manner substantially affecting the rights, duties, or obligations of: (1) a member of a regulated group or profession; or (2) a member of the public." Md.Code (1984, 2004 Repl.Vol.) § 10–101(h).

**13.** We note that the submission of a regulation via the notice and comment procedures of the APA alone is not determinative of whether a regulation is a law for the purposes of the *ex post facto* clause. On this issue, Maryland is distinguished from other states in that, under the Maryland APA, "an agency's organizational rules, procedural rules, interpretive rules and statements of policy *all* must go through the same procedures as required for legislative rules." *Engineering Mgmt. Servs., Inc. v. Maryland State Highway Admin.*, 375 Md. 211, 232–33, 825 A.2d 966, 978 (2003) (quoting Arnold Rochvarg, Maryland Administrative Law 154–55 (2001)) (footnote omitted) (emphasis added).

**14.** Section 2–109(c) provides:

(c)(1) Except as provided in paragraph (2) of this subsection, the Secretary shall adopt regulations to govern the policies and manage-

Services Article, and have the force of law as they effectively create a new law governing who shall receive special project credits. The "force of law" is evident in the fact that the adoption of the amendments immediately prohibits various categories of inmates from receiving special housing credits for double celling.

As we consider these amendments "laws" for the purposes of the *ex post facto* clause, we now turn to whether these amendments are in violation of the *ex post facto* prohibition.

## II.

Do the amendments to former COMAR 12.02.06.05N(2) (now COMAR 12.02.06.04F(1)) violate the prohibition against *ex post facto* laws by the Federal and Maryland Constitutions?

■ The United States Constitution prohibits the passing of *ex post facto* laws, U.S. Const. art. I, § 9, cl. 3., and dictates that "[n]o State shall ... pass any ... *ex post facto* Law[.]" U.S Const. art. I, § 10, cl. 1. Article 17 of the Maryland Declaration of Rights, is also prohibitive of *ex post facto* laws:

That retrospective Laws, punishing acts committed before the existence of such Laws, and by them only declared criminal are oppressive, unjust and incompatible with liberty; wherefore, no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed, or required.

We have held that the *ex post facto* clause in the Maryland Declaration of Rights has the same meaning as the federal clause. *Anderson v. Department of Health and Mental Hygiene,* 310 Md. 217, 223, 528 A.2d 904, 907 (1987). Two paramount protections provided by the *ex post facto* clause are the assurance "that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until

---

ment of correctional facilities in the Division of Correction in accordance with Title 10, Subtitle 1 of the State Government Article. (2) Paragraph (1) of this subsection does not apply to a guideline pertaining to the routine internal management of correctional facilities in the Division of Correction.

explicitly changed," *Booth v. State*, 327 Md. 142, 174, 608 A.2d 162, 177 (1992) (quoting *Weaver v. Graham*, 450 U.S. 24, 28–29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)), and to restrict "governmental power by restraining arbitrary and potentially vindictive legislation." *Booth, supra*, 327 Md. at 174, 608 A.2d at 177 (quoting *Weaver, supra*, 450 U.S. at 29, 101 S.Ct. 960).

■■ "There is 'no absolute prohibition against retroactive application of a statute.'" *Spielman v. State*, 298 Md. 602, 607, 471 A.2d 730, 733 (1984) (quoting *State Commission on Human Relations v. Amecom Div.*, 278 Md. 120, 123, 360 A.2d 1, 4 (1976)). The retrospective nature of a law, or its applicability to pre-existing cases, does not make it unconstitutional, "unless [it] impair[s] the obligation of contracts or [is] *ex post facto* within the meaning of the Constitution of the United States, or of our Declaration of Rights." *Bartlett v. Ligon*, 135 Md. 620, 626, 109 A. 473, 476 (1920), *superceded by statute on other grounds, Gallaudet University v. National Soc. of the Daughters of the Amer. Revolution*, 117 Md.App. 171, 187, 699 A.2d 531, 538 (1997).

Justice Marshall, writing for the Supreme Court in *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), noted the relevant considerations in analyzing a potential violation of the *ex post facto* clause:

In accord with these purposes, our decisions prescribe that two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it. *Lindsey v. Washington*, [301 U.S. 397, 401, 57 S.Ct. 797, 799, 81 L.Ed. 1182 (1937)]; *Calder v. Bull*, [3 Dall. 386, 390, 1 L.Ed. 648 (1798)]. Contrary to the reasoning of the Supreme Court of Florida, a law need not impair a "vested right" to violate the *ex post facto* prohibition. Evaluating whether a right has vested is important for claims under the Contracts or Due Process Clauses, which solely protect pre-existing entitlements. *See, e.g., Wood v. Lovett*, 313 U.S. 362, 371, 61 S.Ct. 983, 987, 85 L.Ed. 1404 (1941); *Dodge v. Board of Education*, 302 U.S. 74, 78–79, 58 S.Ct. 98, 100, 82 L.Ed. 57

(1937). *See also United States Railroad Retirement Board
v. Fritz,* 449 U.S. 166, 174, 101 S.Ct. 453, 459, 66 L.Ed.2d
368 (1980). The presence or absence of an affirmative,
enforceable right is not relevant, however, to the *ex post
facto* prohibition, which forbids the imposition of punish-
ment more severe than the punishment assigned by law
when the act to be punished occurred. Critical to relief
under the *Ex Post Facto* Clause is not an individual's right
to less punishment, but the lack of fair notice and govern-
mental restraint when the legislature increases punishment
beyond what was prescribed when the crime was consum-
mated. Thus, even if a statute merely alters penal provisions
accorded by the grace of the legislature, it violates the
Clause if it is both retrospective and more onerous than the
law in effect on the date of the offense.

450 U.S. 24, 29–31, 101 S.Ct. 960, 964–65, 67 L.Ed.2d 17 (1981)
(footnotes omitted).

■ The ambit of punishment, for *ex post facto* purposes,
extends beyond a prison sentence or fine. *Anderson, supra,*
310 Md. at 227–28, 528 A.2d at 909–910. In *Lynce v. Mathis,*
519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997), a case
involving several Florida statutes that awarded early release
credits to inmates when the population of the state prison
system exceeded particular levels, the Supreme Court consid-
ered whether a 1992 Florida statute canceling said statutes for
certain classes of offenders, after they had been awarded,
constituted an "increased punishment," and thus violated the
*Ex Post Facto* Clause of the Federal Constitution. *Lynce,
supra,* 519 U.S. at 435, 117 S.Ct. at 893. Lynce had previously
been sentenced to 22 years in prison for attempted murder.
*Id.* He was released in 1992 after accumulating five different
types of early release credits, 1,860 days of which were
"provisional credits" given as a result of prison overcrowding.
*Id.* at 435–36, 117 S.Ct. at 893. Subsequent to Lynce's
release, the Florida Attorney General issued an opinion that
interpreted a 1992 statute as having canceled all provisional
credits awarded to inmates convicted of murder and attempted
murder. *Id.* This interpretation resulted in Lynce's rearrest

and return to custody with a new release date set for 1998. *Id.* Lynce's petition for a writ of habeas corpus alleged that the retroactive cancellation of his provisional credits violated the *ex post facto* clause. *Id.* Lynce's petition was dismissed as the Magistrate Judge, and then the District Court, found that the sole purpose of the revocation of the provisional credits was to alleviate prison overcrowding. *Id.*

The Supreme Court reversed the District Court and Magistrate Judge. The Court cited *Weaver v. Graham, supra,* where it considered whether the retroactive decrease in the amount of credits awarded as a result of an inmate's good behavior violated the *ex post facto* clause.[15] The Court in *Lynce* noted that the new statute did not withdraw credits already awarded to the inmate in *Weaver,* but rather, it "curtail[ed] the availability of future credits [and] effectively postponed the date when he would become eligible for early release." *Lynce, supra,* 519 U.S. at 442, 117 S.Ct. at 896. The Court cited its holding in *Weaver* that the retroactive decrease in that case violated the *ex post facto* clause because it made punishment for crimes committed before its enactment " 'more onerous.' " *Id.* at 442, 117 S.Ct. at 896 (quoting *Weaver, supra,* 450 U.S. at 36, 101 S.Ct. at 968). The Court noted that the focus of *ex post facto* analysis should not be on the Legislature's subjective intent, but instead, on "whether objectively the new statute 'lengthen[ed] the period that someone in petitioner's position must spend in prison.' " *Id.* (quoting *Weaver, supra,* 450 U.S. at 33, 101 S.Ct. at 967).

---

**15.** In *Weaver,* the petitioner had been sentenced to 15 years for second-degree murder and at the time of his plea, Florida law provided that credits based on an inmate's good conduct could be awarded in the amount of 5 days per month for the first two years on an inmate's sentence, in the amount of 10 days per month for the inmate's third and fourth years, and 15 days per month for years subsequent. *Weaver, supra,* 450 U.S. at 26, 101 S.Ct. at 963. Pursuant to this law, Weaver could possibly be released after serving less than nine years of his given sentence. *Id.* The Florida Legislature later enacted a new scheme for calculating gain-time, authorizing 3, 6 and 9 days per month instead of 5, 10, and, 15 days per month. *Id.*

In determining the changes in the "quantum of punishment" an individual incurs, the Court in *Lynce* reiterated its holding in *California Dep't of Corr. v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995). While serving a sentence for his second murder,[16] Morales became eligible for parole in 1990, and the California Board of Prison Terms ("the Board") held a hearing on Morales's suitability for parole, as required by California law. *Id.* at 502–503, 115 S.Ct. at 1600. The Board was required by law to set a release date for Morales, unless it found that "the public safety requires a more lengthy period of incarceration for this individual." *Id.* at 503, 115 S.Ct. at 1600. (Citation omitted). Morales was found unsuitable for parole for many reasons, "including the heinous, atrocious, and cruel nature of his offense; the mutilation of [his second victim] during or after the murder; respondent's record of violence and assaultive behavior; and respondent's commission of his second murder while on parole for his first." *Id.* (Citation omitted).

The law in place at the time Morales murdered Ms. Washabaugh would have entitled Morales to subsequent yearly parole suitability hearings. In 1981, however, the California Legislature authorized the Board to defer such hearings for up to three years "if the prisoner has been convicted of 'more than one offense which involves the taking of a life' and if the Board 'finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding.'" *Id.* (Citation omitted) (footnote omitted). For the same reasons that it found Morales ineligible for parole, the Board determined that a longer observation period was required for Morales and before a

---

**16.** Morales was found guilty of the first-degree murder of his girlfriend, and he was sentenced to life in prison. *Morales, supra,* 514 U.S. at 502, 115 S.Ct. at 1599. Morales was eventually released to a halfway house and around that time married Lois Washabaugh, a 75–year–old woman with whom he had become acquainted while serving his first sentence. *Id.* After Ms. Washabaugh was reported missing, Morales subsequently entered a plea of *nolo contendre* to second degree murder of his wife, and was sentenced to a term of 15 years to life. *Id.* at 502, 115 S.Ct. at 1600.

parole release date could be projected, and "the Board determined that it was not reasonable to expect that respondent would be found suitable for parole in 1990 or 1991," and thus scheduled his next hearing for 1992. *Id.*

Morales filed a federal habeas corpus petition in the United States District Court for the Central District of California, arguing that the 1981 amendment constituted an *ex post facto* law. *Id.* at 504, 115 S.Ct. at 1600. The United States Court of Appeals ultimately concluded that " 'any retrospective law making parole hearings less accessible would effectively increase the [prisoner's] sentence and violate the *ex post facto* clause,' " *Id.* (quoting *Morales v. California Dep't of Corr.,* 16 F.3d 1001, 1004 (9th Cir.1994)), and held that Morales must be provided with the annual parole suitability hearings required by the law in effect when he committed his crime. *Id.* The Supreme Court concluded in *Morales* that the amendment to California's parole procedures decreasing the frequency of parole hearings for certain offenders did not elicit a change in the overall amount of time the affected offender would serve, and thus constituted a "speculative and attenuated" possibility of increasing the offender's punishment, and thus did not implicate the *ex post facto* clause. *Id.* at 509, 115 S.Ct. at 1603.

The Supreme Court in *Lynce* rejected respondent's argument that the 1992 statute did not violate the *ex post facto* clause because, when Lynce entered his guilty plea, he could not have possibly expected to receive overcrowding credits, and because it created an effect similar to that in *Morales,* of only "the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes." *Lynce, supra,* 519 U.S. at 446, 117 S.Ct. at 898 (citing *Morales, supra,* 514 U.S. at 509, 115 S.Ct. at 1603). In its rejection of this contention, the Court noted that the fact that Lynce's 1,860 credits, already awarded, were retroactively canceled left little speculation as to what might have happened to him: he was rearrested and subjected to a prolonged imprisonment. *Id.* at 446–47, 117 S.Ct. at 898. The Court further held:

Unlike the California amendment at issue in *Morales*, the 1992 Florida statute did more than simply remove a mechanism that created an opportunity for early release for a class of prisoners whose release was unlikely; rather, it made ineligible for early release a class of prisoners who were previously eligible—including some, like petitioner, who had actually been released.

*Id.* at 447, 117 S.Ct. at 898.

### The Instant Case

In our review of the decision of an administrative agency, we consider the agency's decision pursuant to the "same statutory standards as would the circuit court, and we do not employ those standards to reevaluate the decision of the circuit or intermediate appellate court." *Charles County Dep't of Soc. Servs. v. Vann*, 382 Md. 286, 294, 855 A.2d 313, 318 (2004). Our role is limited to ascertaining whether there exists substantial evidence in the record as a whole that supports the findings and conclusions of the agency; we must also determine "if the administrative decision is premised upon an erroneous conclusion of law." *United Parcel Serv., Inc. v. People's Counsel for Baltimore County*, 336 Md. 569, 577, 650 A.2d 226, 230 (1994).

Here, the amendments in question are clearly retroactive for the purposes of the *ex post facto* clause as they concern the now ineligible crimes committed prior to the adoption of the amendments. We must then consider whether the amendments impose a punishment on the respondents that is "more severe than the punishment assigned by law when the act to be punished occurred." *Weaver, supra*, 450 U.S. at 30, 101 S.Ct. at 965. We conclude that the amendments in the instant case do impose a more severe punishment upon respondents than that which was annexed to their actions on the date their crimes were committed. The respondents, if they continued to be double celled, would have had the opportunity to obtain double-celling special project credits in the future, and thus, decrease the amount of time they would have to serve on their respective sentences, but for the amendments

which disqualified one of their previously qualifying crimes. Retroactive alteration of regulations that determine an inmate's eligibility for early release implicates the *ex post facto* clause because those credits count as " 'one determinant of [a] petitioner's prison term . . . and . . . [the petitioner's] effective sentence is altered once this determinant is changed.' " *Lynce, supra,* 519 U.S. at 445, 117 S.Ct. at 898 (quoting *Weaver, supra,* 450 U.S. at 32, 101 S.Ct. at 966). The prison terms of the respondents here were altered by the amendment's inclusion of their respective crimes in its prohibition of special project credits for that class of inmates.

Further, petitioner attempts to distinguish the present case from *Lynce* because, unlike the amendments in that case, the DOC in the instant case did not cancel any credits previously earned by respondents. We find this argument unpersuasive. While the amendment in the present case did not revoke credits already given to the respondents, it instead, "curtail[ed] the availability of future credits [and] effectively postponed the date when [respondents] would become eligible for early release," which has been found by the Supreme Court to also constitute an increased punishment in *ex post facto* terms. *Lynce, supra,* 519 U.S. at 442, 117 S.Ct. at 896. *Cf. Alston v. Robinson,* 791 F.Supp. 569, 590 (D.Md.1992) (holding that an amendment to Article 31B of the Maryland Code providing that the Patuxent Institution Board of Review "may" grant parole to an inmate under certain circumstances, instead of the former language that the Board of Review "shall" grant parole under said circumstances, did not violate the *ex post facto* clause because it did not prescribe more punishment or provide less opportunity for the inmate to shorten his criminal sentence) (citation omitted).

We also disagree with petitioner's attempts to distinguish the present case from *Weaver* on the grounds that the availability of the special project credits in the present case were discretionary, rather than mandatory, as were the credits in the *Weaver* case. We note that the parties in *Lynce, supra,* raised similar arguments about the nature of the credits at issue, and how that nature would factor into the Court's *ex*

*post facto* analysis. The petitioner in *Lynce,* a case that involved credits given as a result of overcrowding, argued that his case was comparable to *Weaver* because both cases involved the issuance of credits that were "dependent on an inmate's good conduct." *Lynce,* 519 U.S. at 442, 117 S.Ct. at 896. The respondent in *Lynce* countered that *Weaver* was not controlling because "it was the overcrowded condition of the prison system, rather than the character of the prisoner's conduct, that gave rise to the award." *Id.* The Supreme Court declined to adopt either contention, stating:

In our view, both of these submissions place undue emphasis on the legislature's subjective intent in granting the credits rather than on the consequences of their revocation.

In arriving at our holding in *Weaver,* we relied not on the subjective motivation of the legislature in enacting the gain-time credits, but rather on whether objectively the new statute "lengthen[ed] the period that someone in petitioner's position must spend in prison." *Id.,* at 33, 101 S.Ct., at 967. Similarly, in this case, the fact that the generous gain-time provisions in Florida's 1983 statute were motivated more by the interest in avoiding overcrowding than by a desire to reward good behavior is not relevant to the essential inquiry demanded by the *Ex Post Facto* Clause: whether the cancellation of 1,860 days of accumulated provisional credits had the effect of lengthening petitioner's period of incarceration.

In our post-*Weaver* cases, we have also considered whether the legislature's action lengthened the sentence without examining the purposes behind the original sentencing scheme. In *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987), we unanimously concluded that a revision in Florida's sentencing guidelines that went into effect between the date of petitioner's offense and the date of his conviction violated the *Ex Post Facto* Clause. Our determination that the new guideline was " 'more onerous than the prior law,' " *id.,* at 431, 107 S.Ct., at 2452 (quoting *Dobbert v. Florida,* 432 U.S. 282, 294, 97 S.Ct. 2290, 2298–2299, 53 L.Ed.2d 344 (1977)), rested entirely on an objective

appraisal of the impact of the change on the length of the offender's presumptive sentence. 482 U.S., at 431, 107 S.Ct., at 2452 ("looking only at the change in primary offense points, the revised guidelines law clearly disadvantages petitioner and similarly situated defendants").

*Id.* at 442–43, 117 S.Ct. at 896–97. We find this analysis instructive in the instant case. The nature of the special project credits in this case is irrelevant for the purposes of our *ex post facto* analysis. The focus of our analysis is not on whether these credits were mandatory or discretionary but, rather, whether the amendments to the regulations which provides these credits has the effect of lengthening respondents' sentences and is more "onerous" than the prior law.[17] As we have already noted, the sentences of those individuals who are double celled, and whose qualifying crimes have been

---

**17.** It is also for this reason that we choose not to follow *Gwong v. Singletary,* 683 So.2d 109 (Fla.1996). Gwong filed a petition for writ of mandamus asking Florida's highest court to require Florida's Department of Corrections ("the Florida DOC") to make "incentive gain-time" available to a specific group of inmates that were being denied eligibility for the "gain-time" by a rule amendment that "retroactively denie[d] to certain prisoners, who ha[d] 85% or less of their prison sentences remaining, the ability to earn incentive gain-time." *Gwong,* 683 So.2d at 110 (citing Florida Administrative Code Rule 33–11.0065 (1996)). "Incentive gain time" is similar to the Maryland's offer of "good conduct credits" in that it allowed the Florida DOC to award up to 20 days of gain-time "for each month in which a prisoner works diligently, participates in training, uses time constructively, or otherwise engages in positive activities." *Id.* at 111. (citations omitted). The court in *Gwong* ultimately held that the amendment in that case violated the *ex post facto* clause as it was both retrospective, and served to increase the measure of punishment for inmates because it "eliminate[d] the ability of certain inmates to earn incentive gain-time credits." *Id.* at 114.

*Gwong,* however, is inapposite to the present case. The *Gwong* court differentiated between the various types of gain time in determining the application of the *ex post facto* clause. *See id.* at 115. In the instant case we choose to follow the precedent set by the United States Supreme Court in *Lynce,* and rely not on the subjective motivation in the enactment of, and amendments to, the special project credit regulations, but rather on whether the amendments lengthened the period that individuals in respondents' position must spend incarcerated. *See Lynce,* 519 U.S. at 442, 117 S.Ct. at 896 (quoting *Weaver, supra,* 450 U.S. at 33, 101 S.Ct. at 967).

changed to disqualifying crimes by the amendments, have clearly been lengthened.

We do not find the increased punishment caused by the amendments in this case, as petitioner argues, to be "speculative and attenuated." We note that the case from which that language originates, *Morales, supra,* is factually distinguishable from the present case. In *Morales,* the statutory change affected the frequency of parole eligibility hearings for inmates by giving parole officials the ability, after meeting several procedural safeguards, to postpone an inmate's yearly evaluation by up to three years when potential safety issues, among other things, were a concern, and parole officials believed the inmate would not be eligible for parole during the extended period regardless. Morales's *ex post facto* claims were rejected as the chances of an increased punishment were "speculative and attenuated." Here, respondents will clearly serve a longer period of time as a result of the amendments and the determination of that increase is far easier than in *Morales.*

Moreover, we note that the language included in the regulation providing that, "[t]his section may not be interpreted . . . to mean that an inmate who is eligible to receive the credits described in this section has a right to these credits or . . . will continue to receive these credits in the future," does not provide sufficient notice to inmates for the purposes of the *ex post facto* prohibition, see *Miller v. Florida,* 482 U.S. 423, 431, 107 S.Ct. 2446, 2452, 96 L.Ed.2d 351 (1987). That disclaimer alone does not exempt the regulation from *ex post facto* scrutiny.

The amendments at issue in the present case are constitutionally valid when applied to inmates who are double celled and who committed any of the enumerated disqualifying crimes after the date that the amendments took effect on January 2, 2002. Our holding applies only to those inmates who committed one or more of the enumerated disqualifying crimes prior to the adoption of the amendments. We do not propose to limit the authority of the Secretary or the Commis-

sioner, and acknowledge that they must be allowed to manage the DOC effectively. Their authority, however, cannot exceed Constitutional bounds. We affirm the decision of the intermediate appellate court reversing the decisions of the Secretary.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**[18]

---

18. The injunction imposed staying the issuance of the mandate and enforcement of the judgment of the Court of Special Appeals is hereby dissolved.