*Edward Effion Hill v. State of Maryland*, No. 1503, September Term 2019.  Opinion by Beachley, J.

**APPELLATE JURISDICTION—PETITION FOR COMMITMENT FOR SUBSTANCE ABUSE TREATMENT—MULTIPLE FILINGS PERMITTED—FINAL JUDGMENT**

***EX POST FACTO* CLAUSE—SIGNIFICANT RISK OF INCREASED PUNISHMENT BY PROLONGING TERM OF INCARCERATION**

In 2011, appellant Edward Hill received a twenty-five year sentence for first-degree assault, a concurrent twenty year sentence for use of a handgun in the commission of a crime of violence, and a concurrent fifteen year sentence for possession of a firearm by a person convicted of a crime of violence.

In December 2017, Hill petitioned the Circuit Court for Prince George's County pursuant to Health General ("HG") § 8-507 for commitment to the Department of Health for drug treatment.  The court denied the petition, but suggested that Hill petition again in approximately one year.

On October 1, 2018, the General Assembly amended HG § 8-507 to prevent a court from granting a petition for commitment for a defendant convicted of a crime of violence until the defendant is eligible for parole.

In March 2019, Hill again petitioned for HG § 8-507 commitment.  The court granted the petition, apparently unaware of the General Assembly's recent amendment.  The Department of Health responded by informing the court that, due to the amendments to HG § 8-507, Hill could not be committed until he reached parole eligibility after May 10, 2024.  Hill then filed a motion in the circuit court asking it to backdate its decision and grant his petition.  Hill further argued that application of the amended HG § 8-507 violated the *Ex Post Facto* Clause of the United States Constitution.  The court denied Hill's petition and held that there was no *ex post facto* violation.

Hill timely appealed, and the State moved to dismiss the appeal, arguing that this Court lacks jurisdiction pursuant to *Fuller v. State*, 397 Md. 372 (2007).

*Held*: Motion to dismiss denied.  Judgment reversed.

In *Fuller*, the Court of Appeals held that the denial of an HG § 8-507 petition is not appealable because it is not a final judgment.  Regarding final judgments, the *Fuller* Court held that because an inmate may file unlimited HG § 8-507 petitions, a single denial does not constitute an appealable final judgment.

Hill's circumstances are distinguishable from Fuller's due to the 2018 amendments to HG § 8-507. Whereas Fuller was permitted to file multiple HG § 8-507 petitions and was eligible for commitment at all times, the 2018 amendments to HG § 8-507 have effectively terminated Hill's ability to seek a commitment until he reaches parole eligibility in 2024. The court's denial of Hill's petition settled the rights of the parties and effectively foreclosed any relief to Hill. Accordingly, unlike in *Fuller*, Hill's denial constitutes a final judgment, and is therefore appealable to this Court.

Not only does this Court have jurisdiction to consider Hill's appeal, but the 2018 amendments to HG § 8-507 constitute an *ex post facto* violation when applied to Hill.

An *ex post facto* violation may occur where a change in the law creates a significant risk of increasing the punishment attached to a crime. Here, the 2018 amendments increased Hill's punishment; absent the 2018 amendments, Hill would have been released from prison and committed to the Department of Health in 2019, subject to appropriate probationary conditions. The 2018 amendments, however, now require Hill to serve his sentence until at least 2024. Because the amendments increase Hill's punishment, they violate the *Ex Post Facto* Clause of the United States Constitution.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1503

September Term, 2019

_____

EDWARD EFFION HILL

v.

STATE OF MARYLAND

_____

Beachley,
Gould,
Woodward, Patrick L.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Beachley, J.

_____

Filed: August 26, 2020

*Leahy, Andrea M., J., did not participate in the Court's decision to designate this opinion for publication pursuant to Maryland Rule 8-605.1.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In 2011, appellant Edward Effion Hill was convicted of first-degree assault and related firearm crimes. At the time of Hill's conviction, he had an essentially unrestricted right to file petitions requesting commitment to the Department of Health for substance abuse treatment pursuant to section 8-507 of the Health General Article as it existed prior to October 1, 2018. Effective October 1, 2018, however, the General Assembly amended that statute to preclude a court from ordering a commitment for substance abuse treatment for a defendant convicted of a crime of violence "until the defendant is eligible for parole." Md. Code (2019 Repl. Vol.), § 8-507 of the Health General Article ("HG"). Because Hill was convicted of first-degree assault—a crime of violence—he contends that the legislature's amendments violate the *Ex Post Facto* Clause found in Article I of the United States Constitution and Article 17 of the Maryland Declaration of Rights.

In response to Hill's appeal, the State filed a motion to dismiss, arguing that Court of Appeals precedent requires dismissal of the appeal for lack of jurisdiction. As we shall explain, we conclude that we have jurisdiction to review the denial of Hill's petition. We further conclude that the 2018 amendments to HG § 8-507, as applied to Hill, violate the *Ex Post Facto* Clause of the United States Constitution.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2011, Hill was convicted of first-degree assault, use of a handgun in the commission of a crime of violence, and possession of a firearm by a person convicted of a crime of violence. He was sentenced to twenty-five years for the assault charge; twenty years, concurrent, for use of a handgun; and fifteen years, concurrent, for possession of a firearm.

On December 15, 2017, Hill filed a motion pursuant to HG § 8-507 requesting commitment to the Department of Health in order to receive drug treatment. At a hearing on March 13, 2018, the Circuit Court for Prince George's County denied the petition, stating:

> [A]s I indicated, I fully intend to grant this motion at some point. . . . I'm just not ready to do it today and let me tell you why. . . . [T]here were a couple of other prior criminal events and particularly in the armed robbery which is also a crime of violence. Normally, for a crime of violence, the parole considerations is [sic] fifty percent (50%). You haven't even served a third and that is sort of the minimum that I think would be appropriate. . . . I know this is disappointing and discouraging, but the reason you're here is so you can hear me say that if you continue on the path that you're currently on, you do everything you should do, you continue to progress, I will grant this motion in about a year.

On March 4, 2019, Hill again petitioned for HG § 8-507 commitment. After a hearing on May 10, 2019, the court granted the petition, pending availability of a bed. The court stated its reasoning for granting the petition as follows:

> You . . . are an example of someone who did everything you could to get better. You got your GED. You have been engaged in a lot of programs. You have a letter from your supervisor at the plant. You have done what we hope as a society prison will do for everybody, and that is make some change in your focus and your approach and, as you said, in your decision-making. So I recognize it's a very serious crime, and I recognize the position of the victim's family.
>
> I am going to sign the Health General Commitment for you.

On May 23, 2019, the Department of Health sent a letter to the court indicating that, as a result of amendments to HG § 8-507, Hill would not be eligible for the treatment program "until parole eligibility after May 10, 2024." At the time of Hill's conviction, Hill was eligible for commitment pursuant to HG § 8-507(a), which then provided:

2

Subject to the limitations in this section, a court that finds in a criminal case or during a term of probation that a defendant has an alcohol or drug dependency may commit the defendant as a condition of release, after conviction, or at any other time the defendant voluntarily agrees to participate in treatment, to the Department for treatment that the Department recommends, even if:

(1) The defendant did not timely file a motion for reconsideration under Maryland Rule 4-345; or
(2) The defendant timely filed a motion for reconsideration under Maryland Rule 4-345 which was denied by the court.

On October 1, 2018, however, the General Assembly amended HG § 8-507, disallowing commitment for prisoners convicted of crimes of violence until they become eligible for parole. The statute now reads:

(a) (1) Except as provided in paragraph (2) of this subsection and subject to the limitations in this section, a court that finds in a criminal case or during a term of probation that a defendant has an alcohol or drug dependency may commit the defendant as a condition of release, after conviction, or at any other time the defendant voluntarily agrees to participate in treatment, to the Department for treatment that the Department recommends, even if:

(i) The defendant did not timely file a motion for reconsideration under Maryland Rule 4-345; or
(ii) The defendant timely filed a motion for reconsideration under Maryland Rule 4-345 which was denied by the court.

**(2)(i) If a defendant is serving a sentence for a crime of violence, as defined in § 14-101 of the Criminal Law Article, a court may not order the Department to treat a defendant under this section until the defendant is eligible for parole.**

(ii) Nothing in this paragraph may be construed to prohibit a defendant who is serving a sentence for a crime of violence, as defined in § 14-101 of the Criminal Law Article, from participating in any other treatment program or receiving treatment under the supervision of the Department under any other provision of law.

(Emphasis added).

3

In response to the Health Department's May 23, 2019 letter, Hill filed a motion asking the court to "issue an order back[-]dating the [c]ourt's decision to the March 13, 2018 hearing date to permit the defendant to be placed into treatment in the Maryland Department of Health."

At the August 16, 2019 hearing on Hill's motion, Hill argued that application of the amended HG § 8-507 violated the *ex post facto* prohibition in Article I of the United States Constitution and Article 17 of the Maryland Declaration of Rights. The circuit court found no *ex post facto* violation, and consequently determined that it could no longer grant Hill's petition, stating,

> I do feel bad about what I said in that I cannot go forward with that. But I feel very strongly that I would be violating the law if I tried to find a way around what our Legislature has said. And of all people, I should not be doing that. . . . So I'm sorry . . . . I just don't see any way I can now commit him to the Department of Health.

Hill then noted this appeal. We shall provide additional facts as necessary.

## MOTION TO DISMISS

The State preliminarily moves to dismiss Hill's appeal. In its motion, the State argues that this Court lacks jurisdiction to consider the appeal pursuant to *Fuller v. State*, 397 Md. 372 (2007). While we recognize the similarities between *Fuller* and the instant case, we nevertheless conclude that, although the circuit court's denial of Fuller's HG § 8-507 petition *did not* constitute a final judgment, the denial of Hill's petition *does*. Accordingly, this Court has jurisdiction to consider Hill's appeal.

4

In *Fuller*, the Court of Appeals was tasked with "determining whether an order denying an inmate commitment to a drug treatment program pursuant to [HG § 8-507] is appealable." *Id.* at 375. In 1979, Fuller received a life sentence for first-degree murder. *Id.* at 377. Later that same year, Fuller pleaded guilty to first-degree rape and robbery with a deadly weapon, and consequently received a concurrent life sentence for those crimes. *Id.* at 377–78.

In 2005, Fuller, representing himself, filed a petition for commitment to a drug treatment program pursuant to HG § 8-507. *Id.* at 378. The circuit court summarily denied Fuller's petition, and Fuller noted an appeal to this Court. *Id.* As part of his appellate argument that the circuit court erred in denying his petition, Fuller also claimed that this Court "had jurisdiction to entertain the appeal under either the final judgment rule or the collateral order doctrine." *Id.* This Court disagreed and dismissed the appeal, holding that Fuller's petition was not appealable due to lack of jurisdiction. *Id.* at 379 (citing *Fuller v. State*, 169 Md. App. 303, 308-09 (2006)). The Court of Appeals granted Fuller's petition for writ of certiorari, but ultimately affirmed this Court's dismissal, holding that "the denial of a petition for commitment for substance abuse treatment pursuant to [HG § 8-507] is not an appealable order." *Id.* at 380.

The Court of Appeals began its discussion by outlining Fuller's argument. *Id.* First, Fuller claimed that the denial of his petition constituted a final judgment pursuant to Md. Code (1973, 2002 Repl. Vol.), § 12-301 of the Courts and Judicial Proceedings Article

("CJP") and was therefore appealable.[1]  *Id.*  Alternatively, Fuller argued that even if the denial of his petition did not constitute a final judgment, his petition was nevertheless appealable pursuant to the collateral order doctrine.  *Id.*  Additionally, Fuller analogized his petition for commitment to a motion for modification of sentence pursuant to Maryland Rule 4-345(e).  *Id.*  The Court of Appeals rejected these arguments.

The Court first explained the scope of the right to appeal in Maryland, stating that, "In Maryland, the right to seek appellate review is statutory; the Legislature can provide for, or preclude, the right of appeal."  *Id.* at 382 (citing CJP § 12-301).  The Court noted that "An appeal, ordinarily, must await the entry of a final judgment."  *Id.* at 383 (citing CJP § 12-302).  "To be a final judgment, the decision 'must be so final as to determine and conclude rights involved, or deny the appellant means of further prosecuting or defending his rights and interests in the subject matter of the proceeding.'"  *Id.* (quoting *Sigma Reprod. Health Ctr. v. State*, 297 Md. 660, 665 (1983)).  The Court then explained that the collateral order doctrine is an exception to the final judgment rule:

> One exception to the final judgment rule is the collateral order doctrine, that applies to a narrow class of orders, referred to as collateral orders, which are offshoots of the principal litigation in which they are issued and which are immediately appealable as 'final judgments' without regard to the posture of the case.

*Id.* (some quotation marks omitted) (quoting *Jackson v. State*, 358 Md. 259, 266–67 (2000)).

The Court began its analysis by rejecting Fuller's comparison of the denial of an

---

[1] CJP § 12-301 has remained unchanged since 1991.

HG § 8-507 petition to a motion to correct an allegedly illegal sentence. *Id.* at 387, 389. Instead, the Court suggested that an HG § 8-507 petition more closely resembles a petition for writ of habeas corpus because both are statutory causes of action. *Id.* at 389. Turning to the appealability of habeas petitions, the Court noted that, prior to 1945, a petitioner could not appeal the denial of a habeas petition because the "denial was not a final judgment in as much as the petitioner had the ability to repeatedly apply for a writ of habeas corpus." *Id.* at 390–91. In 1945, however, the General Assembly, recognizing that a single petitioner effectively had the right of thirty-six appeals by filing separate applications to each judge in the State, finally "provided an aggrieved party with the statutory right to appeal the denial of a petition for writ of habeas corpus or from a 'final order of the Court' in habeas corpus proceedings[.]" *Id.* at 391–92.

Comparing the right to appeal in habeas petitions to that of HG § 8-507, the Court stated,

> The General Assembly, then, in the history of habeas corpus petitions, proactively and clearly conferred the right of appeal to petitioners denied relief, whereas this Court had refused appellate review because the petition in issue could have been filed repeatedly. This was not done in [HG § 8-507] when petitioners were given the opportunity to repeatedly file their suit. We generally presume that the Legislature acts with full knowledge of prior and existing law, legislation, and policy, and obviously could have provided an appellate remedy for the denial when a petition could be repeatedly filed.

*Id.* at 393 (citations omitted).

The Court next considered whether the denial of Fuller's petition constituted a final judgment. *Id.* at 393. The court noted that it had "consistently held that a final judgment from which an appeal will lie is one which settles the rights of the parties or concludes the

7

cause." *Id.* at 393 (quoting *In re Special Investigation No. 231*, 295 Md. 366, 370 (1983)).

Holding that Fuller's denial did not constitute a final judgment, the Court stated,

> the denial of Fuller's petition did not settle Fuller's ability to seek commitment pursuant to [HG § 8-507] for substance abuse treatment. Under [HG § 8-507], a petition may be filed at any "time the defendant voluntarily agrees to participate in treatment." Thus, petitions may be filed repeatedly and the denial of a single petition does not preclude Fuller from filing another.

*Id.* at 394.

As an example of a final judgment, the Court cited *In re Special Investigation No. 236*, 295 Md. 573 (1983). There, "the issue was whether the grant of a motion to obtain the return of financial records from a grand jury constituted a final judgment." *Fuller*, 397 Md. at 394 (citing *In re Special Investigation No. 236*, 295 Md. at 575). The Court determined that the granting of that motion constituted a final judgment because "'[o]nce that motion was *granted* there was nothing more to be done in [that] particular case' because the documents would have been returned to the petitioner, and out of the grand jury's control." *Id.* (citing *In re Special Investigation No. 236*, 295 Md. at 575). Whereas the return of the financial records "'settled the rights of the parties and terminated the cause' for good[,]" "the denial of Fuller's petition did not settle his rights under [HG § 8-507] for good because his ability to seek commitment under the statute was not terminated." *Id.* (quoting *In re Special Investigation No. 236*, 295 Md. at 575).[2]

---

[2] The Court went on to hold that the collateral order doctrine exception to the final judgment rule did not apply, thus concluding that Fuller's denial was not appealable. *Fuller*, 397 Md. at 395. Because we conclude that Hill's denial *does* constitute a final judgment, we need not determine whether the collateral order doctrine applies here.

Although Fuller's ability to seek commitment under the statute was not terminated when the Court decided his case in 2007, the 2018 amendments have effectively terminated Hill's ability to seek commitment pursuant to HG § 8-507. We explain.

Regarding final judgments,

> The Court of Appeals has frequently stated that the accepted test for finality is whether the court's ruling has the effect of putting the parties out of court and denying them the means of further prosecuting the case or the defense. *See, e.g., Houghton v. Cty. Comm'rs of Kent Cty.* (*Houghton II*), 307 Md. 216, 221 (1986). According to the Court: "To have the attribute of finality, the ruling must be so final as either to determine and conclude the rights involved or to deny the appellant the means of further prosecuting or defending his or her rights and interests in the subject matter of the proceeding." [*Rohrbeck v. Rohrbeck*, 318 Md. 28, 41 (1989)] (italics removed). A ruling is final if it is "unqualified" and if "nothing in the trial court's action suggested any contemplation that a further order be issued or that anything more be done." *Doehring v. Wagner*, 311 Md. 272, 275 (1987); *see* [*Miller & Smith at Quercus, LLC v. Casey PMN, LLC*, 412 Md. 230, 243 (2010)].

Judge Kevin F. Arthur, *Finality of Judgments and Other Appellate Trigger Issues* 5 (3d ed. 2018).

*Causion v. State*, 209 Md. App. 391 (2013), provides useful guidance in determining the finality of the circuit court's decision here. In *Causion*, this Court held that the denial of a request to disclose grand jury proceedings constituted a final judgment and was therefore appealable. *Id*. at 394. There, thirteen years after a grand jury indicted him on charges of first-degree murder and use of a handgun to commit murder, "Causion filed a motion seeking disclosure of confidential grand jury testimony pursuant to Md. Rule 4-642(d) and a request for a hearing on that motion." *Id*. at 395. Following the denial of his

9

motion, Causion appealed, and the State moved to dismiss, arguing that this Court lacked jurisdiction to review the appeal. *Id.* at 397.

We disagreed with the State and held that the denial of Causion's motion constituted a final judgment because the court's denial "settled the rights of the parties in that it denied Causion's request to obtain access to the proceedings of the grand jury. There was nothing more that the court could do to give effect to its ruling and Causion sought no other relief." *Id.* at 398–99.

In reaching this holding, we rejected an argument similar to that which the State has made here—that a movant's apparent ability to file multiple requests on the same issue eliminates the finality of a denial. *Id.* at 400–01. In *Causion*, the State analogized Causion's appeal to that in *Fuller*, noting that, like in HG § 8-507, "there is nothing in Rule 4-642 that prevents a movant from filing multiple requests for access to grand jury records." *Id.* We rejected this analogy, however, stating that,

> While [HG § 8-507] permits multiple petitions for commitment, there is nothing in Rule 4-642 that suggests that a person may file repeated requests for disclosure of grand jury records. To be sure, there is nothing in the rule that explicitly prohibits repeated motions but, as principles such as law of the case and claim and issue preclusion suggest, it is the policy of the State that courts should provide a final resolution to justiciable issues in a single proceeding. [HG § 8-507] is the exception, not the rule, and for us to hold otherwise would be to expose the circuit courts to repeated requests for identical relief, a policy completely at variance with traditional concepts of judicial efficiency and finality of judgment.

*Id.* at 402.

We find this reasoning persuasive. Where a statute or rule permits a party to file multiple identical requests for relief, but legal principles such as law of the case or issue

10

preclusion prevent the court from exercising its discretion, the court's denial effectively constitutes a final judgment. Like the final judgment in *Causion*, the circuit court's decision here that the *Ex Post Facto* Clause did not apply, and that the 2018 amendments prohibited it from granting Hill's commitment, "settled the rights of the parties in that it denied [Hill's] request" for commitment until Hill becomes eligible for parole. *Id*. at 399. These circumstances rendered the circuit court's decision a final judgment because "[t]here was nothing more that the court could do to give effect to its ruling and [Hill] sought no other relief." *Id*. Although HG § 8-507 generally permits unlimited petitions for commitment, the 2018 amendments now restrict courts from committing violent offenders for treatment until they have reached parole eligibility. As Hill points out in his answer to the State's motion, "The point in *Fuller* about a defendant being allowed to file 'at any other time' means more than the ability to physically present a piece of paper to the court." We agree. Here, the circuit court determined that the 2018 amendments precluded it from committing Hill pursuant to HG § 8-507 until he attained parole eligibility in 2024. And the court's express determination that application of the 2018 amendments to Hill do not violate the *Ex Post Facto* Clause is final in that it denies Hill any possibility of being granted an HG § 8-507 commitment until after he reaches parole eligibility. To that extent, the ruling is "unqualified" and "nothing in the trial court's action suggested any contemplation that a further order be issued or that anything more be done." *Doehring*, 311 Md. at 275. Accordingly, the denial of Hill's HG § 8-507 petition constitutes a final judgment, and this Court has jurisdiction to consider the appeal. We now turn to Hill's *ex post facto* claims.

11

## DISCUSSION

Hill argues that the retroactive application of HG § 8-507(a)(2)(i) violates the *Ex Post Facto* Clause of both the U.S. Constitution and Article 17 of the Maryland Declaration of Rights.  Relying on language in *Fuller* that a "petition for commitment does not affect the length of a sentence, only where a portion of it is to be served," 397 Md. at 389, the State responds that the 2018 amendments do not violate *ex post facto* prohibitions because they do not affect the length of Hill's sentence.  We disagree with the State and hold that the 2018 amendments as applied to Hill violate the U.S. Constitution's proscription of *ex post facto* laws because the amendments create a "significant risk" of increasing Hill's punishment by prolonging his term of incarceration.[3]

Our starting point is the United States Constitution, which provides that "No State shall . . . pass any . . . *ex post facto* Law[.]"  U.S. Const. art. I, § 10, cl. 1.  To understand the United States Supreme Court's interpretation and application of the *Ex Post Facto* Clause, we begin with *Collins v. Youngblood*, 497 U.S. 37 (1990).  Because of misleading language in prior Supreme Court opinions, Chief Justice Rehnquist began his recounting of the history of the *Ex Post Facto* Clause with *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798):

> Justice Chase's now familiar opinion in *Calder* expounded those legislative Acts which in his view implicated the core concern of the *Ex Post Facto* Clause:
>
> > "1st.  Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action.  2d.  Every law that *aggravates* a *crime*, or makes it *greater* than it was, when committed.  3d.  Every law

---

[3] Because we conclude that the 2018 amendments violate the federal prohibition on *ex post facto* laws, it is unnecessary to consider Hill's Article 17 claims.

12

that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender*."

*Collins*, 497 U.S. at 41–42 (quoting *Calder*, 3 U.S. at 390). Chief Justice Rehnquist continued:

So well accepted were these principles that the Court in *Beazell v. Ohio*, 269 U.S. 167, 46 S. Ct. 68, 70 L. Ed. 216 (1925), was able to confidently summarize the meaning of the Clause as follows:

"It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*."

*Collins*, 497 U.S. at 42 (quoting *Beazell*, 269 U.S. at 169–70). The Court concluded that "[t]he *Beazell* formulation is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause: Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Id.* at 43.

The Chief Justice proceeded to explain that two of the Court's decisions "do not fit into this analytical framework": *Kring v. Missouri*, 107 U.S. 221 (1883), and *Thompson v. Utah*, 170 U.S. 343 (1898). *Collins*, 497 U.S. at 47. The *Kring* Court defined an *ex post facto* violation as one which "in relation to the offence or its consequences, alters the situation of a party *to his disadvantage*." *Id.* (emphasis added) (quoting *Kring*, 107 U.S.

13

at 228–29). In *Thompson*, the Court defined an *ex post facto* violation as the deprivation of "a substantial right involved in [the defendant's] liberty." *Id.* *Collins* expressly overruled *Kring* on the basis that *Kring*'s use of the more expansive disadvantage test "departs from the meaning of the Clause as it was understood at the time of the adoption of the Constitution[.]" *Id.* at 50. As to *Thompson*, which involved Utah's attempt to reduce the number of jurors in noncapital cases from twelve to eight, *Collins* held that "[t]o the extent that *Thompson v. Utah* rested on the *Ex Post Facto* Clause and not the Sixth Amendment, we overrule it." *Id.* at 51–52. Thus, *Collins* made clear that *Thompson*'s "deprivation of a substantial right" test had no relevance in an *ex post facto* inquiry.

Since *Collins*, the Supreme Court has consistently adhered to the same test regarding *Calder*'s third category of *ex post facto* violations: Does the change in law create a "significant risk" of increasing the punishment attached to the crimes? *See Peugh v. United States*, 569 U.S. 530, 539 (2013) ("The touchstone of this Court's inquiry is whether a given change in law presents a 'sufficient risk of increasing the measure of punishment attached to the covered crimes,'" (quoting *Garner v. Jones*, 529 U.S. 244, 250 (2000)); *Garner*, 529 U.S. at 251 ("The question is whether the amended [law] creates a significant risk of prolonging respondent's incarceration."); *Cal. Dep't of Corrections v. Morales*, 514 U.S. 499, 509 (1995) ("In evaluating the constitutionality of the [change in law], we must determine whether it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes.").

Having established the appropriate test for federal *ex post facto* violations, we shall examine specific cases to assist us in applying the test to the instant case. In our review of

14

the Supreme Court jurisprudence, we find the Court's analysis in *Peugh* most instructive. There, Peugh was convicted in 2010 for bank fraud violations that occurred in 1999 and 2000. *Peugh*, 569 U.S. at 533–34. At Peugh's 2010 sentencing, the Government sought to use the 2009 Federal Sentencing Guidelines, but Peugh argued that the *Ex Post Facto* Clause required that he be sentenced under the more lenient 1998 version of the Guidelines that were in effect when he committed his crimes. *Id.* The two versions of the Guidelines produced significantly different results: the sentencing range under the 2009 Guidelines was 70 to 87 months whereas the 1998 Guidelines yielded a sentencing range of only 30 to 37 months. *Id.* at 534. The district court rejected Peugh's *ex post facto* argument and sentenced him to 70 months' imprisonment. *Id.* at 534–35. After the Seventh Circuit affirmed, the Supreme Court granted certiorari to resolve a conflict between the circuits "over whether the *Ex Post Facto* Clause may be violated when a defendant is sentenced under the version of the Sentencing Guidelines in effect at the time of sentencing rather than the version in effect at the time the crime was committed, and the newer Guidelines yield a higher applicable sentencing range." *Id.* at 535.

The Court began its *ex post facto* analysis by noting that "[t]he touchstone of this Court's inquiry is whether a given change in law presents a 'sufficient risk of increasing the measure of punishment attached to the covered crimes.'" *Id.* at 539 (quoting *Garner*, 529 U.S. at 250). The Court concluded that, even though the federal Guidelines are discretionary, "[a] retrospective increase in the Guidelines range applicable to a defendant creates a sufficient risk of a higher sentence to constitute an *ex post facto* violation." *Id.* at

15

544. The Court concluded that Peugh's case fell "within *Calder*'s third category of *ex post facto* violations," and held:

> "[T]he *Ex Post Facto* Clause forbids the [government] to enhance the measure of punishment by altering the substantive 'formula' used to calculate the applicable sentencing range." That is precisely what the amended Guidelines did here. Doing so created a "significant risk" of a higher sentence for Peugh, and offended "one of the principal interests that the *Ex Post Facto* Clause was designed to serve, fundamental justice."

*Id.* at 550 (alterations in original) (citations omitted).

*Lynce v. Mathis*, 519 U.S. 433 (1997), also provides helpful guidance. Beginning in 1983, Florida "enacted a series of statutes authorizing the department of corrections to award early release credits to prison inmates" when the prison system's population exceeded particular levels. *Id.* at 435. In 1992, the Florida legislature passed a statute that canceled the prison overcrowding credits "for certain classes of inmates, including those convicted of attempted murder." *Id.* at 438–39. As a result of the 1992 statute, "credits for 2,789 inmates who were still in custody were canceled, and rearrest warrants were issued for 164 offenders who had been released." *Id.* at 439.

Lynce was one of the 164 inmates who had been released as a result of the prison overcrowding credits. *Id.* at 435. In 1986, Lynce received a sentence of twenty-two years for attempted murder. *Id.* He was released in 1992 after accumulating five different types of early release credits, including 1,860 days awarded as "provisional credits" related to prison overcrowding. *Id.* at 435–36. Shortly after Lynce's release, the Florida attorney general issued an opinion in which it concluded that the 1992 statute retroactively canceled all provisional credits awarded to inmates convicted of murder or attempted murder. *Id.* at

16

436. Based on the attorney general's opinion, Lynce was rearrested and returned to prison with a new release date in 1998. *Id.*

Lynce then filed a petition for a writ of habeas corpus, alleging that the retroactive cancellation of his accumulated prison overcrowding credits violated the *Ex Post Facto* Clause. *Id.* After being denied relief in the district court and the Eleventh Circuit, the Supreme Court, noting a conflict between the Tenth and Eleventh Circuits on the issue, granted certiorari. *Id.*

The *Lynce* Court initially recognized that *ex post facto* cases most frequently arise from *Calder*'s third category. *Id.* at 441 ("The bulk of our *ex post facto* jurisprudence has involved claims that a law has inflicted 'a greater punishment, than the law annexed to the crime, when committed.'" (quoting *Calder*, 3 U.S. at 390)). Relying on its prior decision in *Weaver v. Graham*, 450 U.S. 24 (1981), the *Lynce* Court stated,

> As we recognized in *Weaver*, retroactive alteration of parole or early release provisions, like the retroactive application of provisions that govern initial sentencing, implicates the *Ex Post Facto* Clause because such credits are "one determinant of petitioner's prison term . . . and . . . [the petitioner's] effective sentence is altered once this determinant is changed." We explained in *Weaver* that the removal of such provisions can constitute an increase in punishment, because a "prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed."

*Lynce*, 519 U.S. at 445–46 (alterations in original) (citations omitted). The Court determined that the 1992 statute as applied to Lynce violated the *Ex Post Facto* Clause because application of the new statute "resulted in his rearrest and prolonged his imprisonment." *Id.* at 446–47. This violated the *Ex Post Facto* Clause because "it made

17

ineligible for early release a class of prisoners who were previously eligible—including some, like [Lynce], who had actually been released." *Id.* at 447.

*Lynce* provides an appropriate backdrop for a discussion of the Court of Appeals's decision in *Sec'y, Dep't of Pub. Safety & Corr. Servs. v. Demby*, 390 Md. 580 (2006). *Demby* involved an *ex post facto* challenge to the amendment of COMAR provisions concerning special project credits available to inmates. *Id.* at 584–85. At the time the respondent inmates committed their crimes, COMAR 12.02.06.05N provided, in pertinent part, as follows:

> N. Special Project Credit for Double Celled Inmates.
>
> (1) Inmates who meet the eligibility criteria in § N(2) are in a special project pursuant to Article 27, § 700(f), Annotated Code of Maryland, except inmates who are serving a:
>
> (a) Sentence for murder, rape, sex offenses, child abuse, drug trafficking or distribution, or use of a firearm in the commission of a felony;
>
> (b) Mandatory sentence for the commission of a felony; or
>
> (c) Sentence as a repeat offender under Article 27, § 643B, Annotated Code of Maryland.

*Id.* at 593–94.

The challenged amendment, COMAR 12.02.06.04F, expanded the crimes for which an inmate would be ineligible to earn special project credits. *Id.* at 591–93. COMAR 12.02.06.04F, effective January 1, 2002, provided in pertinent part:

F. Special Projects Credit for Housing.

(1) Except as provided in § F(3) of this regulation, an inmate may be awarded special projects credit for housing under Correctional Services Article, § 3-707, Annotated Code of Maryland, if the inmate is:

   (a) Assigned to a cell containing two beds and is not serving a period of disciplinary segregation; or

   (b) Housed in a dormitory or dormitory-type housing and the housing area where the inmate is confined does not provide 55 square feet of living space per inmate, exclusive of dayrooms, toilets, and showers.

(2) An inmate may be awarded a maximum of five special projects credits for housing for each calendar month, and on a prorated basis for any portion of a calendar month, beginning on a date and ending on a date the Secretary determines appropriate, based on the demand for inmate housing and services in the Division, subject to §§ F(3) and G of this regulation.

(3) An inmate may not be awarded special projects credit under this section during the inmate's term of confinement if the inmate is serving a term of confinement that includes a:

   (a) Sentence for:

      (i)   Abduction;

      (ii)  Arson in the first degree;

      (iii) Carjacking or armed carjacking;

      (iv)  Kidnapping;

      (v)   Manslaughter, except involuntary manslaughter;

      (vi)  Mayhem and maiming, as previously proscribed under Article 27, §§ 384−386, Annotated Code of Maryland;

      (vii) Murder or attempted murder;

      (viii) Use of a handgun in the commission of a felony or other crime of violence;

(ix)  Child abuse, abuse or neglect of a vulnerable adult, or child sale, barter, or trade under Criminal Law Article, § 3-601, 3-602, or 3-603, Annotated Code of Maryland;

(x)   Assault on a Division inmate or employee under Criminal Law Article, § 3-205, Annotated Code of Maryland;

(xi)  A drug crime; or

(xii) An offense which would cause the offender to be defined as a child sexual offender, offender, sexually violent offender, or sexually violent predator under Criminal Procedure Article, Title 11, Subtitle 7, Annotated Code of Maryland;

(b)  Mandatory sentence for the commission of a felony; or

(c)  Sentence as a repeat offender under Criminal Law Article, § 14-101, Annotated Code of Maryland.

(4)  This section may not be interpreted, understood, or construed to mean that an inmate who is eligible to receive the credits described in this section has a right to these credits or that an inmate will continue to receive these credits in the future.

*Id.* Demby and the other respondent inmates challenged the amendment on *ex post facto* grounds, asserting that they had been eligible for special project credits prior to the 2002 amendment, but that the 2002 amendment's expansion of the list of disqualifying crimes eliminated their eligibility to earn such credits.  *Id.* at 587–88.

After determining that the COMAR regulations qualified as "laws" for purposes of *ex post facto* analysis, the Court of Appeals concisely formulated the constitutional question: "Do the amendments to former COMAR 12.02.06.05N(2) (now COMAR 12.02.06.04F(1)) violate the prohibition against *ex post facto* laws by the Federal and Maryland Constitutions?"  *Id.* at 608.  The Court initially noted that "[w]e have held that the *ex post facto* clause in the Maryland Declaration of Rights has the same meaning as the

20

federal clause." *Id.* The Court then examined *Lynce* at some length, noting that the Supreme Court found an *ex post facto* violation because the retroactive decrease in prison overcrowding credits "made punishment for crimes committed before [the statute's] enactment 'more onerous.'" *Id.* at 611 (quoting *Lynce*, 579 U.S. at 542). The Court further cited *Lynce* for the proposition that the principal focus of *ex post facto* analysis is "whether objectively the new statute lengthen[ed] the period that someone in [Lynce's] position must spend in prison." *Id.* (quotations omitted) (quoting *Lynce*, 579 U.S. at 442).

The *Demby* Court unanimously held that the 2002 COMAR amendment violated the *Ex Post Facto* Clause as it applied to Demby and his similarly-situated respondent inmates, stating:

> Here, the amendments in question are clearly retroactive for the purposes of the *ex post facto* clause as they concern the now ineligible crimes committed prior to the adoption of the amendments. We must then consider whether the amendments impose a punishment on the respondents that is "more severe than the punishment assigned by law when the act to be punished occurred." We conclude that the amendments in the instant case do impose a more severe punishment upon respondents than that which was annexed to their actions on the date their crimes were committed. The respondents, if they continued to be double celled, would have had the opportunity to obtain double-celling special project credits in the future, and thus, decrease the amount of time they would have to serve on their respective sentences, but for the amendments which disqualified one of their previously qualifying crimes. Retroactive alteration of regulations that determine an inmate's eligibility for early release implicates the *ex post facto* clause because those credits count as "'one determinant of [a] petitioner's prison term . . . and . . . [the petitioner's] effective sentence is altered once this determinant is changed.'" The prison terms of the respondents here were altered by the amendment's inclusion of their respective crimes in its prohibition of special project credits for that class of inmates.

*Id.* at 614–15 (alterations in original) (citations omitted) (first quoting *Weaver*, 450 U.S. at 30; then quoting *Lynce*, 519 U.S. at 445). Although the Court recognized that the

21

respondent inmates' circumstances were different from those of the inmates in *Lynce* because the 2002 COMAR amendment did not revoke any credits already awarded, it nevertheless concluded that the amendment "curtail[ed] the availability of future credits [and] effectively postponed the date when [respondents] would become eligible for early release." *Id.* at 615 (alterations in original) (quoting *Lynce*, 519 U.S. at 442). That result constituted an "increased punishment" prohibited by the *Ex Post Facto* Clause. *Id.* at 614–15.

The Supreme Court and Court of Appeals jurisprudence compels us to conclude that the 2018 amendments to HG § 8-507, as applied to Hill, violate the *Ex Post Facto* Clause. The parties agree that when Hill received his 25-year sentence for first-degree assault in 2011, he was eligible for commitment pursuant to HG §§ 8-505 and 8-507. Because of Hill's conviction of a violent crime, his eligibility for commitment ended with the passage of the 2018 amendments. Specifically, the General Assembly added subsection (a)(2) to HG § 8-507,[4] which provides:

> (2)(i) If a defendant is serving a sentence for a crime of violence, as defined in § 14-101 of the Criminal Law Article, a court may not order the Department to treat a defendant under this section until the defendant is eligible for parole.
>
> (ii) Nothing in this paragraph may be construed to prohibit a defendant who is serving a sentence for a crime of violence, as defined in § 14-101 of the Criminal Law Article, from participating in any other treatment program or receiving treatment under the supervision of the Department under any other provision of law.

---

[4] The amendments to HG § 8-505 similarly provided that, as to violent offenders, "a court may not order the Department to evaluate a defendant under this section until the defendant is eligible for parole." HG § 8-505(a)(2)(i).

Unaware of the amendments to HG §§ 8-505 and 8-507, the circuit court held a hearing to consider Hill's request for commitment. The court granted Hill's request, issuing a May 10, 2019 order titled "Commitment to the Department of Health and Mental Hygiene for Treatment (Health General 8-507)." The corresponding docket entries state that "[t]he balance of the sentence imposed on November 10, 2011 is suspended upon the availability of a bed, and the Defendant is sentenced as follows: Defendant committed to the Department of Health and Mental Hygiene."

After receiving the court's commitment order, the Department of Health promptly advised the trial judge that "[t]he defendant is not permitted for treatment until parole eligibility after May 10, 2024." There is little doubt that the 2018 amendments formed the basis for the Department of Health's decision not to place Hill for treatment. Dissatisfied with the Department of Health's determination that he was not eligible for HG § 8-507 commitment, Hill filed a "Motion for Appropriate Relief," which the court considered on August 16, 2019. At that hearing, Hill argued that applying the 2018 amendments to him violated the *ex post facto* provisions of the United States and Maryland Constitutions. The court disagreed, effectively ruling that Hill was not eligible for an HG § 8-507 commitment under the 2018 amendments.

As previously noted, the trial court erred. Resolution of this case requires us to consider whether the 2018 amendments created a "significant risk" of increasing the punishment attached to the crimes or, as articulated by the *Demby* Court, "whether the amendments impose a punishment on [Hill] that is 'more severe than the punishment assigned by law when the act to be punished occurred.'" 390 Md. at 614 (quoting *Weaver*,

23

450 U.S. at 30). The State acknowledges that Hill was eligible for an HG § 8-507 commitment at the time he was convicted in 2011 and prior to October 1, 2018. Indeed, the trial court, apparently unaware of the 2018 amendments that made Hill, a violent offender, ineligible for an HG § 8-507 commitment, signed an order committing Hill to the Department of Health for residential treatment. Because HG § 8-507(e)(l)(ii) provides that a court may not commit a defendant for treatment until "[a]ny sentence of incarceration for the defendant is no longer in effect," the court obviously intended to release Hill from his "sentence of incarceration" in favor of residential treatment under the auspices of the Department of Health. Moreover, HG § 8-507(f) provides that a committing court shall order supervision of the defendant in one of three ways: "(1) By an appropriate pretrial release agency, if the defendant is released pending trial; (2) By the Division of Parole and Probation under appropriate conditions . . . if the defendant is released on probation; or (3) By the Department, if the defendant remains in the custody of a local correctional facility." Because Hill was serving a sentence in the Division of Corrections, his only avenue for HG § 8-507 commitment was pursuant to being "released on probation" with supervision by the Division of Parole and Probation. Indeed, the court's docket entry subsequent to the May 2019 hearing indicated that "[t]he balance of [Hill's] sentence imposed on November 10, 2011 is *suspended*[.]" (Emphasis added). In other words, absent the 2018 amendments, Hill would have been released from prison and committed to the Department

24

of Health for residential treatment, subject to appropriate probationary conditions.[5, 6]

In our view, Hill's circumstances present the quintessential *ex post facto* violation—his prison term has *actually* been prolonged by the 2018 change in law that prohibits violent offenders from being committed pursuant to HG § 8-507 until they reach parole eligibility. *See Lynce*, 519 U.S. at 446–47 (recognizing that a change in Florida law actually resulted in Lynce's rearrest, thereby prolonging his imprisonment in violation of *Ex Post Facto* Clause). We therefore conclude that Hill's case falls within *Calder's* third category of *ex post facto* violations because the 2018 amendments retroactively imposed more severe punishment than that which was annexed to his crimes when they were committed. As such, application of the 2018 amendments to Hill offends "one of the

---

[5] We reject the State's argument that no *ex post facto* violation exists in this case because the *Fuller* Court stated that an HG § 8-507 "petition for commitment does not affect the length of the sentence, only where a portion of it is to be served." *Fuller*, 397 Md. at 389. The State apparently fails to recognize that Hill would have been released from incarceration and placed on probation as part of the HG § 8-507 commitment. Thus, Hill would not have been returned to prison upon successful completion of inpatient treatment as the State suggests. As we have noted, HG § 8-507's express statutory language does not contemplate such a procedure. In any event, the *Fuller* language relied on by the State is clearly dicta. *See Howsare v. State*, 185 Md. App. 369, 385–86 (2009) (recognizing that *Fuller's* statement that a "petition for commitment does not affect the length of a sentence" was merely dicta and construing the statement "as meaning that the length of the sentence, including the suspended part, is not affected by the filing of a petition for commitment").

[6] Although the trial court intended to suspend Hill's sentence and release him for residential treatment, it failed to order supervision by the Division of Parole and Probation "under appropriate conditions" as mandated by HG § 8-507(f)(2). Accordingly, we shall remand to the circuit court for the purpose of issuing an appropriate probationary order.

25

principal interests that the *Ex Post Facto* Clause was designed to serve, fundamental justice." *Carmell*, 529 U.S. at 531.[7]

**STATE'S MOTION TO DISMISS IS DENIED.**

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS REVERSED. CASE REMANDED TO THAT COURT FOR THE PURPOSE OF ISSUING A PROBATIONARY ORDER AS REQUIRED BY HEALTH GENERAL § 8-507(f)(2). COSTS TO BE PAID BY PRINCE GEORGE'S COUNTY.**

---

[7] We note that the Supreme Court has developed a test separate from *Calder* and its progeny to evaluate whether civil statutes are intended to, or in effect, impose punishment. *See Smith v. Doe*, 538 U.S. 84, 92 (2003). That two-part test attempts to identify whether the *Ex Post Facto* Clause is implicated by first determining whether the legislature intended to impose punishment, and if not, whether "the statutory scheme is 'so punitive in either purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Id*. (alteration in original) (quoting *United States v. Ward*, 448 U.S. 242, 248–49 (1980)).

Courts, including the Court of Appeals, have routinely used this test to evaluate sexual offender registration statutes for claims of *ex post facto* violations. *See Doe v. Dep't of Pub. Safety and Corr. Servs.*, 430 Md. 535 (2013). The two-part test that emanates from *Smith* has no applicability to the instant case because the statutory amendments here directly affect the length of Hill's incarceration as proscribed by the Supreme Court jurisprudence discussed at length in this opinion.